**HANSEN SAVINGS BANK, et al., Plaintiffs,**

v.

**OFFICE OF THRIFT SUPERVISION, et al., Defendants.**

**Civ. A. No. 90–4092.**

United States District Court, D. New Jersey.

Jan. 31, 1991.

Miller, Cassidy, Larroca & Lewin by Herbert J. Miller, John J. Cassidy and David I. Gelfand, for plaintiff Hansen Sav. Bank, SLA.

Dilworth, Paxson, Kalish & Kauffman by David H. Pittinsky and Jeffery P. Greenbaum, for Hansen Bancorp, Elmer and Eileen Hansen.

Martin Jefferson Davis, Sr. Trial Atty., for defendant The Office of Thrift Supervision.

Gary W. Herschman, Trial Atty., for defendant The Federal Deposit Ins. Corp.

## AMENDED MEMORANDUM OPINION AND ORDER

RODRIGUEZ, District Judge.

This case is before this court on plaintiffs Hansen Savings Bank, SLA (HSBSLA), Hansen Bancorp, Inc. (Bancorp), Elmer and Eileen Hansen's (the Hansens) request for declaratory and injunctive relief against the Federal Deposit Insurance Corporation (FDIC) and the Office of Thrift Supervision (OTS). For the reasons stated below, plaintiffs' request for a preliminary injunction is granted.

## I. BACKGROUND

### A. *The Supervisory Merger*

This is yet another suit which has its genesis from the savings and loans crisis of the 1980's. In 1987, the Federal Savings and Loan Insurance Corporation (FSLIC) took control of First Federal Savings and Loan Association (First Federal), a failing thrift located in Hammonton, New Jersey. After assuming control, FSLIC put First Federal up for sale. The ultimate result of First Federal's sale is what the industry terms a "supervisory merger."

The Hansens owned a controlling interest in Raritan Valley Savings and Loan Association (Raritan) in East Brunswick, New Jersey and Hansen Savings Bank in Palm Beach, Florida. The Hansens submitted a bid to merge Raritan with First Federal.[1] After lengthy negotiations, the government accepted the Hansens' bid on May 25, 1988.

### B. *The Merger Terms*

The Hansens contributed $1,000,000 in capital to HSBSLA. They also agreed that HSBSLA would carry $50,000,000 in First Federal non-earning assets until these assets could be disposed of appropriately.

HSBSLA would bear the burden of disposing of these assets; HSBSLA also would absorb the first $5,000,000 of losses incurred on certain First Federal assets.

The plaintiffs argue that the government contractually agreed to do specific things to make this supervisory merger successful. First, FSLIC would indemnify HSBSLA for "losses incurred as a result of undisclosed liabilities and [would] guarantee the liquidation value of certain [First Federal] assets." Plaintiffs' Verified Complaint ¶ 28 at 11. Second, FSLIC agreed to contribute $62,000,000 to eliminate part of First Federal's deficit. Third, FSLIC and the Federal Home Loan Bank Board (FHLBB) agreed to give HSBSLA a period of time to "eliminate the remainder of [First Federal's] deficit." *Id.* ¶ 28 at 12. This third "concession" by the government entailed the FHLBB agreement that HSBSLA would carry "supervisory goodwill for all regulatory capital purposes (with no five-year limitation), and that it would permit supervisory goodwill to be amortized over twenty-five years on a straight-line basis." *Id.* ¶ 29 at 12.

This third "promise" by the government is at the core of this dispute. Plaintiffs argue that the government entered into a contractual obligation to forbear from doing certain things for a period of time and now the government is reneging on its promise.

### C. *Plaintiffs' Alleged Contractual Rights*

Plaintiffs contend that they have contractual forbearances included in the Assistance Agreement concerning the First Federal supervisory merger which are enforceable against the government. Plaintiffs argue that three documents, the May 24, 1988 Assistance Agreement (the Agreement), Federal Home Loan Bank Board Resolution No. 88–406 of May 24, 1988 (FHLBB Resolution) and the May 25, 1988

**1.** The merger involved several steps. Raritan and First Federal merged to create the New Jersey bank of Hansen Savings Bank, SLA (HSBSLA). Bancorp, a thrift holding company, owns 100% of HSBSLA stock. Bancorp also purchased 98.7% of Hansen Savings Bank (HSB) of Florida, a Florida chartered stock savings association. The Hansens own 100% of Bancorp. The only thrift involved in this matter is HSBSLA.

letter from the FHLBB to Raritan President Joseph Paparatto concerning regulatory forbearances (FHLBB Forbearance Letter), are to be read together to create the contractual forbearances involved in this dispute. The pertinent sections of each of the documents are outlined below.

### 1. Accounting Principles
#### a. The Agreement

At section 17, the Agreement provides that generally accepted accounting principles shall govern, "except that where such principles conflict with terms of this Agreement, applicable regulations of the [FHLBB or FSLIC], or any resolution or action of the [FHLBB] approving, or adopted concurrently with, this Agreement, then this Agreement, such regulations, or such resolution or action shall govern." Plaintiffs argue that it is apparent that this Agreement was intended to be read in conjunction with other actions of FHLBB or FSLIC which occurred contemporaneously with the execution of the Agreement. The FHLBB issued a resolution on May 24, 1988 and a letter on May 25, 1988.

#### b. FHLBB Resolution

In the May 24, 1988 FHLBB Resolution, the government provided that

(a) the use of Push-down accounting may be used to reflect the acquisition of Hammonton on the books of ... Raritan subsequent to its merger and on the consolidated books of [Bancorp]; and

(b) the value of any unidentifiable intangible assets resulting from accounting for the Merger in accordance with the purchase method may be amortized ... over a period not to exceed 25 years by the straight line method from the Effective Date ...

Thus, the FHLBB Resolution gave HSBSLA the ability to carry the First Federal deficit on its books as an intangible asset, *i.e.*, supervisory goodwill, to be amortized over a twenty-five year period on a straight-line basis. Under section 17 of the Agreement, this provision would govern HSBSLA's accounting scheme. *See supra* at I.C.1.a. The FHLBB Resolution does not limit the purposes for which

HSBSLA can carry supervisory goodwill on its books.

### 2. Plaintiffs' Alleged Regulatory Forbearances
#### a. The Agreement

Section 16(b) of the Agreement provides that regulatory capital should be maintained pursuant to the current regulations or its successors, "except to the extent that the [FHLBB] has agreed ... to forbear from enforcement of such regulations."

#### b. The FHLBB Resolution

The FHLBB Resolution provides that "the Secretary ... is authorized and directed to send a letter to Raritan concerning forbearances by the [FHLBB] and the FSLIC with respect to certain regulatory requirements in the form, or substantially in the form, of a letter."

#### c. The FHLBB Forbearance Letter

In a letter dated May 24, 1988, the FHLBB stated that it would forbear from enforcing the capital standard regulations promulgated at 12 C.F.R. § 563.13 (1987).

### D. FIRREA and OTS Enforcement
#### 1. FIRREA

In response to the savings and loans crisis, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), P.Law. No. 101–73, 103 Stat. 183 (codified at scattered sections of 12 U.S.C.). FIRREA contains two sections which require analysis. FIRREA § 401(g)(1) states

Existing Rights, Duties, and Obligations Not Affected.—Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—

(A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of applicable law with respect to such Board ... and

(B) existed on the day before the date of the enactment of this Act.

FIRREA § 301 amended the Home Owners' Loan Act of 1933 (HOLA). HOLA § 5(t)(3)(A), 12 U.S.C.A. § 1464(t)(3)(A), (West Supp.1990), states in part:

(A) Certain Qualifying Supervisory Goodwill Included in Calculating Core Capital.— ... [A]n eligible savings association may include qualifying supervisory goodwill in calculating core capital. The amount of qualifying supervisory goodwill that may be included may not exceed the applicable percentage of total assets set forth in the following table:

| For the following period: | The applicable percentage is: |
| --- | --- |
| Prior to January 1, 1992 | 1.500 percent |
| January 1, 1992—December 31, 1992 | 1.000 percent |
| January 1, 1993—December 31, 1993 | 0.75 percent |
| January 1, 1994—December 31, 1994 | 0.375 percent |
| Thereafter | 0 percent. |

## 2. OTS Enforcement

OTS takes the position that HOLA § 5(t)(3)(A) applies to all thrifts, even thrifts which participated in supervisory mergers with potential contractual forbearances. With that interpretation of HOLA § 5(t)(3)(A), the OTS distributed Thrift Bulletin 38–2, "Capital Adequacy," in which it states that the capital standards under FIRREA would be applied to all thrifts, even those with potential contractual forbearances.

Plaintiffs say that FIRREA § 401(g) preserves the contract made with the FSLIC and FHLBB and that HOLA § 5(t)(3)(A) is inapplicable to their situation. Defendants argue that no contract existed to be preserved under FIRREA § 401(g) and that Congress intended HOLA § 5(t)(3)(A) to apply to all thrifts.

## II. JURISDICTION

### A. *The Administrative Procedure Act*

■ This court has jurisdiction under the Administrative Procedure Act (APA) §§ 10(a), (e), 5 U.S.C. §§ 702, 706 (1988). The OTS issued Thrift Bulletin 38–2, in which it states

The Office of Thrift Supervision is applying the new capital standards to all savings associations, including those associations that have been operating under previously granted capital and accounting forbearances. *Section 5(t) of HOLA as amended by [FIRREA] eliminates these forbearances. All savings associations presently operating with these forbearances, therefore, should eliminate them in determining whether or not they comply with the new minimum regulatory capital standards.* (Any FSLIC capital contributions that resulted in the creation of goodwill will be subject to the requirements for goodwill established in the capital regulation). If the association determines that it will fail its minimum regulatory capital requirements upon the elimination of capital and accounting forbearances, it must submit a capital plan ... in accordance with the regulatory capital regulation and Thrift Bulletin 36.

*A capital plan will not be acceptable if it includes the continuation of previously granted capital and accounting forbearances.* Capital plans already submitted that propose to continue previous capital and accounting forbearances will be either disapproved, returned for revision and resubmittal conditionally approved with the requested forbearances denied.

(emphasis added). Thrift Bulletin 38–2 is final agency action within the meaning of APA § 2(c), 5 U.S.C. § 551(4), and is ripe for judicial review. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). "Once an agency publicly articulates an unequivocal position ... and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *CIBA–Geigy Corp. v. E.P.A.,* 801 F.2d 430, 436 (D.C.Cir.1986). As one district court noted, "the language in Thrift Bulletin 38–2 clearly states the position of the OTS that capital and accounting forbearances granted by FSLIC and the FHLBB will no longer be honored. The practical result of that decision is to put [the plaintiff] in the position of not being able to meet the capital requirements of FIRREA and thus be declared an insolvent institution." *Guaranty Fin. Serv. v. Di-*

rector, OTS, 742 F.Supp. 1159, 1162 (M.D. Ga.1990).

Plaintiffs are affected by OTS' policy determination in Thrift Bulletin 38–2. Plaintiffs must submit a capital plan which excludes the alleged contractual forbearances or must capitalize the institution as requested in OTS' letter dated March 14, 1990. Plaintiffs' Appendix of Documents Tab 14.

The defendants argue that review is premature because no final determination has been made concerning HSBSLA's capital plans. But Thrift Bulletin 38–2 makes it clear that OTS will not treat on a favorable basis any capital plan which includes forbearances. Essentially, defendants argue: accept our interpretation or suffer the consequences. Plaintiffs are left with no option. The government's position is untenable.

Defendants conceded at the hearing for a temporary restraining order that FIRREA was being applied to HSBSLA merely because it did not meet the capital standards requirement as interpreted under Thrift Bulletin 38–2. OTS did not express any concern for HSBSLA's current management capabilities. Mr. Rosenberg, counsel for OTS at the hearing for a temporary restraining order stated, "My general understanding ... is that historically here at least ... the local representatives of the O.T.S., view the management of the Savings Bank in a positive light...." Record at 36, *Hansen Sav. Bank v. OTS*, No. 90–4092 (D.N.J. Oct. 18, 1990) (hearing for a temporary restraining order). Defendants have also conceded that this court does have jurisdiction of the OTS Director's determination concerning HSBSLA under APA § 10(e), 5 U.S.C. § 706, but argue that judicial review is premature at this time. OTS' interpretation of FIRREA is a final agency ruling in Thrift Bulletin 38–2 and can be reviewed under the appropriate legal standard.[2] *See Chevron, (U.S.A.), Inc. v. Natural Resource Defense Council*, 467

U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

## III.  ANALYSIS

### A.  *Preliminary Injunction Standard*

In considering an application for a preliminary injunction, four factors must be weighed: "(1) whether the movant has actually shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest." *SI Handling Systems v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985). These four factors will be addressed in turn.

### 1.  Probability of Success on the Merits

The moving party need not prove actual success, but only that he will likely succeed on the merits of his claim. In the present application, plaintiffs have met that burden.

#### a.  *Existence of Contractual Forbearances*
##### i.  New Jersey Law Applies

The Agreement provides at section 23 that, "this Agreement and the parties' rights and obligations under it shall be governed by the law of the State of New Jersey to the extent that Federal law does not control." To the extent that this contract must be interpreted, New Jersey law will apply. *See Kalman Floor Co. v. Jos. L. Muscarelle, Inc.*, 196 N.J.Super. 16, 481 A.2d 553 (App.Div.1984).

New Jersey law provides "that two or more writings which are all parts [sic] of one transaction relating to the same subject matter, are to be read and interpreted as one instrument, whether or not they refer to each other." *Wellmore Builders, Inc. v. Wannier*, 49 N.J.Super. 456, 463, 140 A.2d 422, 426 (App.Div.1958). *See also*

---

**2.** This court need not address whether it has jurisdiction under 12 U.S.C.A. § 1464(d) (West Supp.1990).

*Lawrence v. Tandy & Allen,* 14 N.J. 1, 100 A.2d 891 (1953) ("[t]he writing alone is not 'wholly and intrinsically self-determinative of the parties' intent to make it the sole memorial."). The Third Circuit Court of Appeals has appropriately noted that construing contemporaneous documents is only done when the parties intended such a result. *See Berger v. United States Fidelity & Guaranty Co.,* 834 F.2d 1154, 1161 (3d Cir.1987) ("Only where the documentary proof may be fairly read to indicate that all parties agreed upon the modification of one document will [the court construe the contemporaneous documents together]").

### ii. Documentary Evidence of Contemporaneous Documents

There is ample evidence present to show that the parties intended the entire agreement to include the terms of the FHLBB's Resolution and Forbearance Letter. For instance, the Agreement itself alludes to the FHLBB's Resolution and Forbearance Letter several times. *See* The Agreement § 17 Accounting Principles ("If there is a conflict between such regulations and the [FHLBB's] resolution or action, the [FHLBB's] resolution or action shall govern."); § 16 Additional Covenants (Investors and Bancorp shall cause capital to be maintained "except to the extent that the [FHLBB] has agreed to forbear from enforcement of such regulations"); § 24 Entire Agreement, Severability (This Agreement is the entire agreement between the parties "excepting only any resolutions or letters issued contemporaneously with this Agreement by the [FHLBB or FSLIC].").

Although the contract contains an integration clause, it excepts the FHLBB's Resolution and Forbearance Letter. Section 24 states,

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only any resolutions or letters issued contemporaneously with this Agreement by the [FHLBB or FSLIC].

There is ample documentary evidence to establish that the parties intended the Agreement, the FHLBB's Resolution and Forbearance Letter to compose one agreement.

### iii. Oral Testimony Concerning the Parties' Intent

Regarding the parties' intent, Mr. Jere Young, HSBSLA's Chief Executive Officer, testified to the following during direct examination:

Q: During the negotiations [of the supervisory merger] was there any effort made to try to negotiate with the government to put in 40 million dollars instead of giving you supervisory goodwill of 40 million dollars?

A: There was negotiations [sic] to that effect, yes. I mean, the attempt always by the acquiring organization in those days was to have the government put in more money, the FSLIC put in more. And the effort by the FSLIC was also to conserve its money to do more deals. So their efforts were to put in less and do other things to encourage the transaction without putting in cash.

Q: Well, is it fair to say that as the negotiations ended up, the 40 million dollars in goodwill was in lieu of a 40 million dollar payment by the federal government?

A: That's certainly the way we looked at it. We would not have done the transaction were it not for our belief in that.

Q: Without the 40 million dollars in goodwill, would [HSBSLA] have gone through with the merger?

A: Not unless it was substituted for cash or some other asset.

Q: Why would you not have gone through with the merger?

A: Well, we would not have done it. We had a healthy thrift which was well capitalized. We would not have done an acquisition if we immediately faced insolvency or additional regulations or restriction. And we had to believe that over a period of time we could turn what—turn the resulting organization into a healthy, thriving, capitalized thrift.

Record at 18–19, *Hansen*, No. 90–4092 (D.N.J. Nov. 7, 1990) (hearing for a preliminary injunction). Young's testimony explains the bargain made between the plaintiffs and the government. The plaintiffs were willing to assume the $40,000,000 deficit as supervisory goodwill in the merged institution (HSBSLA) if the government agreed to forbear from enforcing its capital standard regulations for a period of time. Both parties knew at the outset that the $40,000,000 deficit had to be paid out in cash or assumed by one of the parties as an asset or liability. The government bargained for HSBSLA carrying the $40,000,-000 deficit on the books as an asset. This permitted the government to use its limited funds to facilitate other supervisory mergers. There is every indicia that there was bargained for consideration between the parties concerning the capital standard forbearances. There is also ample oral testimony to conclude that the parties intended the Agreement, the FHLBB Resolution and the FHLBB Forbearance Letter to be one agreement.

### b. Interpretation of FIRREA

Other courts which have addressed this issue have held that FIRREA does not abrogate assistance agreements which were formed in supervisory mergers. *See Franklin Fed. Sav. Bank v. Director, OTS,* No. 2–90–166, 1990 WL 123145 slip op. at 3 (E.D.Tenn. July 16, 1990). One court stated "Congress could not have intended a result so inequitable as the complete abrogation of a long term agreement upon which plaintiffs, in this case and others relied in investing large sums of capital." *Guaranty Financial,* 742 F.Supp. at 1162.

These courts imply that FIRREA §§ 401 and 301 should be read to complement each other and not to create an internal inconsistency in FIRREA's statutory scheme. As such, section 401 is read to preserve contractual forbearances of capital standards even though section 301 states that the new capital standards apply to all thrifts.

### c. OTS' Interpretation of FIRREA May Be Unreasonable

One court has specifically addressed OTS' interpretation of FIRREA and the deference it should be given under the test established in *Chevron. See Sterling Sav. Ass'n v. T. Timothy Ryan, Director of OTS,* 751 F.Supp. 871 (E.D.Wash.1990). The *Sterling* court rejected the government's interpretation of FIRREA because "consistent" in 12 U.S.C. § 1464(t) "can convey a multitude of ideas, many of which are as viable or more viable than [OTS' interpretation]." *Id.* at 880. The court further stated that "Congress expressly preserved [the bank's] contract under § 401 ... it would appear to be somewhat incongruous for Congress immediately to turn around and nullify these same agreements." *Id.* at 880. The court also stated that it was "persuaded by the lack of specificity in the statute with regard to contracts of this nature." *Id.* (footnote omitted). Judge Quackenbush's reasoning on this matter is persuasive.

### d. Waiver of Legislative Action

Another court has implied that the contractual forbearances granted by FSLIC and the FHLBB were an absolute waiver by the government from applying capital standards to these respective institutions even in the light of new congressional action concerning capital standards. *Far West Fed. Bank v. Director, OTS,* 746 F.Supp. 1042 (D.Or.1990). After reviewing pertinent Supreme Court cases, the *Far West* court stated

It is clear that the Conversion Agreement is far more than an expression of regulatory policy.... The economic impact on plaintiffs of repudiation of the Conversion Agreement is severe. The investors relied on promises that regulatory forbearances would continue for ten years.... Finally, the nature of the governmental action is clear and unmistakable on the face of the Conversion Agreement. As I have already noted, it states an intention to be contractually bound, mutual promises and consideration.... The provision establishing termination of the Conversion Agreement

sets out ... methods of termination. None includes a change of heart.

*Id.* at 1050-51. These courts have stated that the sovereign waived its right to make legislative changes respecting these institutions and the contractual forbearances should be honored.

The plaintiffs have presented an adequate case and I find that they have shown likelihood of success on the merits.

### 2. Irreparable Harm

Plaintiffs have provided adequate evidence to establish irreparable harm. Because of OTS' current interpretation of FIRREA, HSBSLA has lost business in the secondary mortgage and construction loan areas, several key employees have left the bank and HSBSLA has suffered a loss of public confidence. These losses affect HSBSLA's overall business reputation, which one court has noted may not have any calculable monetary value.

> Although, theoretically, the harm to these various interests might be compensated monetarily, common sense dictates that, on a practical level, the true measure of damage is beyond reasonable calculation. Indeed, the present harm to [the Bank's] reputation and the resulting loss of investor confidence and new business most likely will never be known.

*Sterling Sav. Ass'n v. T. Timothy Ryan, Director of OTS*, 751 F.Supp. 871, 877 (E.D.Wash.1990). I am satisfied that irreparable harm is present for an injunction to issue.

### 3. and 4. Injury to the Nonmoving Party and the Public Interest

Defendants argue that issuing the injunction in this case "would irreparably injure defendants, undermining the public interest ... in ensuring that the nation's thrifts are adequately capitalized." Defendants' Reply Memorandum at 75.

But defendants do not point out that, if the current restrictions on this thrift continue, the inevitable result may be to cause another thrift to be sold or liquidated. By enforcing FIRREA's capital standards on HSBSLA, the OTS will create the situation it seeks to avoid: creating an insolvent thrift which becomes part of the public charge. That result is far from being in the public interest. Thrifts that are failing or being mismanaged should be aggressively pursued. In this case, there is no evidence of mismanagement. HSBSLA did not receive gratuitous forbearances. Plaintiffs contributed substantial assets and agreed to absorb a failing thrift's losses in order to help relieve the government of its insurance obligation. Under these circumstances, the nonmoving party is not harmed nor is issuing the injunction contrary to the public interest.

### IV. CONCLUSION

For the reasons stated above,

IT IS ORDERED on this 31st day of January, 1991, that the Director of the Office of Thrift Supervision is PRELIMINARILY ENJOINED from:

1. declaring HSBSLA's current noncompliance with HOLA § 5(t)(3)(A), 12 U.S.C.A. § 1464(t)(3)(A) (West Supp.1990), an unsafe or unsound practice under HOLA § 5(s)(3), 12 U.S.C.A. § 1464(s)(3) (West Supp.1990); HOLA § 5(t)(6)(E), 12 U.S.C.A. § 1464(t)(6)(E) (West Supp.1990), and the regulations promulgated thereunder;

2. excluding HSBSLA's supervisory goodwill, as stated in the Agreement, FHLBB Resolution and Forbearance Letter, from its capital calculations for all regulatory purposes;

3. taking ANY action against HSBSLA based solely on HSBSLA's noncompliance with HOLA § 5(t)(3)(A), 12 U.S.C.A. § 1464(t)(3)(A) (West Supp.1990);

4. enforcing the current operating restrictions imposed in OTS' letters to the plaintiffs dated February 2, 1990, February 12, 1990, March 14, 1990 and April 23, 1990; and

IT IS FURTHER ORDERED that plaintiffs are required to post $1000.00 as security pursuant to Fed.R.Civ.P. 65(c).