**HANSEN BANCORP, INC.,
et al., Plaintiffs,**

**and**

**Federal Deposit Insurance Corp.,
Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

**No. 92–828C.**

United States Court of Federal Claims.

April 10, 2001.

Richard E. Miller, Philadelphia, PA, for plaintiffs. David L. Braverman, Braverman Kaskey & Caprara, of counsel.

Maria B. Valdez, Washington, DC, for plaintiff-intervenor. Mary Helen Ratchford, Federal Deposit Insurance Corp., of counsel.

William G. Kanellis, Washington, DC, with whom was *Acting Assistant Attorney General* Stuart E. Schiffer, for defendant. Michael M. Duclos, Department of Justice, of counsel.

## *OPINION*

MILLER, Judge.

Having received this case by assignment on December 28, 2000, the court confronts multiple pending motions, which have been argued in one setting: 1) Plaintiffs' and Defendant's Cross-motions for Partial Summary Judgment Pursuant to the Omnibus Case Management Order of September 18, 1996; 2) Intervenor's "Short Form" Motion for Partial Summary Judgment on Liability; 3) Defendant's Opposition to Intervenor's Short Form Motion for Partial Summary Judgment and Cross-motion for Summary Judgment; 4) Defendant's Motion To Dismiss and Amended Motion for Summary Judgment on the Claims of Intervenor; and 5) Defendant's Motion To Dismiss Plaintiffs' Counts I–IX, and Supplement to Defendant's Cross-motion for Summary Judgment.

Pursuant to the Omnibus Case Management Order, the issues to be decided are 1) whether a contract existed between the parties; 2) whether the Government is liable for breach of contract due to federal legislation; and 3) whether plaintiffs Elmer F. Hansen, Jr., G. Eileen Hansen, and Hansen Bancorp (collectively "shareholder-plaintiffs"), as well as intervenor Federal Deposit Insurance Corporation (the "FDIC"), have standing to bring a claim against the United States for breach of contract relating to their acquisition of First Federal Savings and Loan Association of Hammonton.

## FACTS

This case is but one galaxy in the ever-expanding *Winstar* universe. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

1. *The parties and the Assistance Agreement*

In 1987 the Federal Savings and Loan Insurance Corporation ("FSLIC") assumed control of First Federal Savings and Loan of Hammonton ("Hammonton") after Hammonton became insolvent during the 1980's savings and loan "crisis." FSLIC sought private entities to acquire Hammonton and other failed savings and loan institutions in order to reduce FSLIC's costs incurred from managing the failed institutions' loans. FSLIC accepted the bid from Raritan Valley Savings and Loan Association ("Raritan") to acquire Hammonton. The previous year, Elmer F. Hansen, Jr., and G. Eileen Hansen (the "Hansens") had purchased all the outstanding common stock of Raritan Valley Financial Corporation, which, in turn, owned all of the outstanding common stock of Raritan. Anticipating the Hammonton acquisition, the Hansens formed Hansen Bancorp ("Bancorp"), a wholly-owned holding company. The Supervisory Merger Assistance Agreement (the "Agreement")[1] established the terms for merging Hammonton into Raritan. Signatories to the Agreement were FSLIC, the Hansens, and Edward G. Fitzgerald, on behalf of both Raritan and Bancorp.

The Agreement incorporated three documents: Federal Home Loan Bank Board ("FHLBB") Resolution No. 88–406 (the "Resolution"), FHLBB letter (the "Forbearance Letter"), and the opinion letter from Peat Marwick Main & Co (the "Accountant Letter"). The Resolution[2], the first document integrated into the Agreement, describes how the parties were to perform the contractual promises memorialized in the Agreement. Dated May 24, 1988, the Resolution included recitals, as well as the duties and benefits of all parties involved. Among the recitals was FHLBB's finding that "the Interim Merger, Merger, and acquisitions by [Bancorp] are necessary to prevent the probable failure of Hammonton . . . ." The Resolution at 19.

The Forbearance Letter to the President and CEO of Raritan from FHLBB's Assistant Secretary, dated May 25, 1988, described the regulatory requirements that FSLIC would not apply to Raritan with respect to Raritan's acquisition of Hammonton. The Forbearance Letter repeats FSLIC's promise not to take regulatory action against Raritan should Raritan fail to meet regulatory capital requirements for any of the enumerated causes. The parties further agreed that the difference between Hammonton's book value and its outstanding obligations would be considered "supervisory goodwill," which, the Forbearance Letter provided, could be amortized by Raritan after the merger.[3]

Pursuant to the Agreement, on May 25, 1988, Hammonton merged with Raritan to create Hansen Savings Bank, SLA ("Hansen Savings"). In addition to the Hammonton transaction, the Hansens bought a majority of stock in PGA Savings and Loan Association of Florida ("PGA"). The Hansens then transferred Hansen Savings and PGA stock, as well as the debt they incurred to purchase the stock, to Bancorp. Hansen Savings was a wholly-owned subsidiary of Bancorp, which, in turn, was wholly-owned by the Hansens.[4]

1. The cover page of the Agreement read: "Assistance Agreement among Raritan Valley Savings and Loan Association, East Brunswick, New Jersey, Elmer F. Hansen, Jr., G. Eileen Hansen, Hansen Bancorp, Inc., and the Federal Savings and Loan Insurance Corporation, Dated May 25, 1988."

2. The Resolution is entitled "Acquisition by Hansen Bancorp, Inc. of PGA Savings and Loan Association, Palm Beach Gardens, Florida, and First Federal Savings and Loan Association of Hammonton, Hammonton, New Jersey by Supervisory Conversion Merger with New Hammonton Federal Savings and Loan Association, Hammonton, New Jersey ('Interim'), an interim federal stock association and subsequent merger of Interim with and into Raritan Valley Savings and Loan Association, East Brunswick, New Jersey."

3. The parties calculated the supervisory goodwill from the excess of the fair market value of liabilities assumed over the fair market value of tangible assets acquired.

4. Bancorp's ownership of more than two savings and loan institutions across state lines carried regulatory implications. A single entity was prohibited from acquiring savings and loan institutions in multiple states unless one was insolvent. 12 U.S.C. § 1730a(e)(3) (1982 & Supp. V 1987).

The third and final document incorporated into the Agreement, the Accountant Letter, was created after the merger.[5] Dated September 22, 1988, the Accountant Letter was addressed to the Federal Home Loan Bank Board of New York, the Supervisory Agent pursuant to the Forbearance Letter and the Resolution. The letter expressed the opinion that the newly-created Hansen Savings had accounted for the merger between Hammonton and Raritan in accordance with generally accepted accounting principles, with the exception of the treatment of the supervisory goodwill. The supervisory goodwill would be amortized over 25 years using the straight-line method.

The Agreement's financial terms were aimed at providing working capital to lead Hammonton out of insolvency. The Agreement called for FSLIC to contribute $62 million directly to Hansen Savings and for the Hansens to make a $1 million capital contribution. Additionally, shareholder-plaintiffs agreed to dispose of Hammonton non-earning assets totaling $50 million. Essential to the Agreement was permitting the supervisory goodwill, totaling $40,485,069.00, to be amortized over 25 years on Hansen Savings' books. Without this treatment of the supervisory goodwill, as well as the regulatory forbearance terms, the merger creating Hansen Savings immediately would have resulted in an insolvent institution.

The parties' ability to perform the Agreement, however, was interrupted by the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 188 ("FIRREA"). FIRREA barred savings and loan institutions, including Hansen Savings, from applying supervisory goodwill towards regulatory capital requirements. In a separate legal action, Hansen Savings successfully enjoined the Office of Thrift Supervision (the "OTS") from enforcing FIRREA's requirements against Hansen Savings more than a year after the enactment of FIRREA. *Han-*

*sen Savings Bank v. OTS*, 758 F.Supp. 240 (D.N.J.1991). Although the New Jersey Federal district court permitted Hansen Savings to apply goodwill towards the regulatory capital requirements, according to defendant, Hansen Savings "still failed to achieve its minimum level of required capital." Def.'s Br. filed Dec. 16, 1999, at 11. Thereafter, on January 10, 1992, the OTS appointed the Resolution Trust Corporation as receiver for Hansen Savings.

### 2. *Procedural history*

Shareholder-plaintiffs filed their complaint in the Court of Federal Claims on December 3, 1992. The case was stayed pending the Supreme Court decision in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432 (1996). In the wake of the Supreme Court decision, on September 18, 1996, Chief Judge Smith entered an Omnibus Case Management Order (the "CMO") to provide a procedural framework for the 100–plus *Winstar*-related cases filed in the United States Court of Federal Claims. The CMO limited a plaintiff's motion for partial summary judgment to two liability-related issues only: 1) whether a contract existed between the parties; and 2) whether the Government was liable for breach of said contract. These motions were referred to as "Short Form" motions.

With respect to defendant's response to the Short Form motions, Chief Judge Smith directed: "[T]he defendant shall set forth … any defenses of which it knows or has reason to know that relate to the two issues asserted in the motion." Intervenor's Br. filed May 15, 1998, at 2 (quoting the CMO ¶ 5(a)). The FDIC filed its Complaint in Intervention as Successor to the Rights of Hansen Savings Bank on March 25, 1997. Accordingly, shareholder-plaintiffs and the FDIC, now intervenor, separately filed Short Form motions for partial summary judgment pursuant to the CMO. Defendant responded with a cross-motion arguing issues relating to damages and causation.[6] In their opposition

---

5. The Forbearance Letter noted Raritan's obligation to submit a certified public accountant's opinion, the Accountant Letter, which would become part of the Agreement.

6. *See* Def.'s Br. filed June 9, 1997, at 4 (arguing that "plaintiffs suffered no damage as a result of FIRREA's capital requirements"); 9–11 (arguing that Hansens control caused Hansen Savings' insolvency, not FIRREA); 18–23 (arguing that

shareholder-plaintiffs argued that defendant's raising issues relating to damages violated the CMO.

On December 12, 1997, Chief Judge Smith ordered defendant to show why plaintiffs' partial summary judgment motions pending in *Winstar*-related cases should not be granted (the "Show Cause" Order). The motion was briefed fully and remains pending. Defendant then filed a motion to dismiss and amended its cross-motion for summary judgment to address intervenor's claims. Defendant also filed a motion to dismiss shareholder-plaintiffs' Counts I–IX. In their opposition shareholder-plaintiffs argued that defendant improperly sought to dismiss their non-contract claims. It is clear the CMO provided that defendant's opposition to plaintiffs' short-form summary judgment motion could only address whether a contract existed and whether the Government acted inconsistently with that contract.

In order to proceed consistently with the CMO, this court limited argument to liability issues relating to the existence of a contract and subsequent breach, so although many of the alternative arguments appearing in the briefs have been considered, those that are deemed unnecessary to resolve are not discussed in this opinion.

## DISCUSSION

Defendant challenges the standing of both shareholder-plaintiffs and the FDIC. Defendant does not deny that the Agreement constitutes a contract, but asserts that the contract was for the benefit of the acquiring thrift, Raritan, and thus the United States does not owe a direct obligation to either shareholder-plaintiffs, or the FDIC, under the contract. Therefore, defendant reasons, plaintiffs are not entitled to sue for damages that may have been caused by any alleged breach of contract.[7] *See* Transcript of Proceedings, *Hans[e]n Bancorp, Inc. v. United*

*States,* No. 92–828C, at 10, (Fed.Cl. Feb. 28, 2001) (hereinafter "*Hans[e]n* Tr.").

### 1. *Shareholder-plaintiffs' standing*

The Supreme Court affirmed the Federal Circuit's *en banc* holding that Assistance Agreement documentation in the transactions examined in the *Winstar* case, including a FHLBB resolution and a forbearance letter, established an express agreement that demonstrated the intent of " 'the parties to be bound by the accounting treatment for goodwill arising in the merger.' " *Winstar,* 518 U.S. at 866, 116 S.Ct. 2432 (quoting *Winstar Corp. v. U.S.,* 64 F.3d 1531 at 1544 (Fed.Cir.1995).) In addition to the goodwill accounting, the Court perceived "no doubt that the parties intended to settle regulatory treatment of these transactions as a condition of their agreement." *Winstar,* 518 U.S. at 863–64, 116 S.Ct. 2432. The Court concluded that both the goodwill treatment and regulatory forbearance were express contract components, because to find otherwise would have left plaintiffs with thrifts insolvent from their creation. *Winstar,* 518 U.S. at 863–64, 116 S.Ct. 2432 (citing *Binghamton Bridge,* 70 U.S. (3 Wall.) 51, 78, 18 L.Ed. 137 (1865) (refusing to construe charter in such a way that it would have been "madness" for private party to enter into it)).

The contract bound the Government to "insure the promisee against loss arising from the promised condition's nonoccurrence." *Winstar,* 518 U.S. at 869, 116 S.Ct. 2432. Thus, when the capital requirements law changed via the enactment of FIRREA, "the Government was unable to perform its promise" and became liable for breach. *Winstar,* 518 U.S. at 870, 116 S.Ct. 2432.

Defendant attempts to distinguish the instant case from the holdings in *Winstar* on the basis of three arguments. First, defendant postulates that the documents in the *Winstar* cases "encompassed only transac-

---

shareholder-plaintiffs' claims must be dismissed because FIREEA did not cause harm to Hansen Savings).

7. Defendant's briefs also made the alternative argument that plaintiffs lack standing to bring a derivative suit. It was re-confirmed at oral argu-

ment that shareholder-plaintiffs are not pursuing a derivative suit claim, so these legal arguments are not discussed in this opinion. *See* Transcript of Proceedings, *Hans[e]n Bancorp, Inc. v. United States,* No. 92–828C, at 6–7, 60 (Fed.Cl. Feb. 28, 2001) ("*Hans[e]n* Tr.").

tions by which a healthy thrift or holding company acquir[ed] a troubled thrift," whereas the documents in the case at bar involve a holding company's obtaining control of a solvent thrift that had merged with both an ailing thrift and a solvent out-of-state thrift. Def.'s Br. filed Oct. 10, 1997, at 2. This argument is utterly unpersuasive as the nature of the documents and the rationale behind entering into the Agreement are, for all intents, identical to those found in *Winstar.*

Second, defendant argues that shareholder-plaintiffs generally lack standing to assert a direct claim for breach of a government contract 1) to which the shareholders were not a party, citing *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693 (1980); 2) in which the Government did not owe a duty to the shareholders independent from their shareholder status, citing *Suess v. United States,* 33 Fed. Cl. 89 (1995); and 3) with respect to which shareholder investments were made in reliance on promises made to another entity, citing *Anderson v. United States,* 47 Fed.Cl. 438 (2000).

In *Robo Wash* the corporation itself, as well as stockholders and two employee stockholders, brought suit as third-party beneficiaries to an alleged agreement between a government employee and another company, Midwest Cabinet Manufacturing Corp. ("Midwest"), approving a loan of $60,000. Robo Wash was to be the guarantor of the $60,000 loan, and the loan authorization was used as security for a $50,000 loan from a bank. Plaintiffs alleged that when the promised loan was not funded, Robo Wash and Midwest defaulted on the $50,000 loan, causing the bank to collect on other past-due obligations from Robo Wash. Defendant moved to dismiss the stockholder plaintiffs and the employee plaintiffs for lack of standing. The court held that all plaintiffs, other than the corporation itself, were not in privity of contract with the Government because they were not parties to the agreement. The court further found that the stockholder and employee plaintiffs did not suffer from direct injuries, as there was no "breach of duty owed to the stockholder personally, and inde-

pendently of his or her status as a stockholder." *Robo Wash,* 223 Ct.Cl. at 697.

*Robo Wash* differs from the instant case in significant respects, not the least of which is that plaintiffs in *Robo Wash* filed neither a response nor an opposition to defendant's motion to dismiss for lack of standing. Furthermore, plaintiffs in the present case are not employees of a company that had entered into a contract with the Government, but are actual parties to the Agreement, as evidenced by their signatures, and the Agreement established duties running from the Government to plaintiffs. Finally, *Robo Wash* may be distinguished by the underlying transactions involved. The Government's alleged breach caused Robo Wash to default on a loan already incurred, whereas in the case at bar the contract was a key part of a supervisory merger of an insolvent savings and loan institution.

Shareholder-plaintiffs in *Suess* sued both derivatively and individually for harm caused to a savings and loan due to the passage of FIRREA. Relying on *Robo Wash,* the court held that shareholder-plaintiffs had standing to maintain a derivative suit only, but lacked standing as individual third-party beneficiaries. *Suess,* 33 Fed.Cl. at 94. While *Suess* is a *Winstar* case, it can be factually distinguished on the basis of the particular shareholder-plaintiffs involved. In *Suess,* "[a]pproximately 1220 ... shareholders owning over 1,140,000 shares had contributed to the funding of [the *Suess* litigation] at the time of the filing of the Amended Complaint." *Suess,* 33 Fed.Cl. at 91–92. Shareholder-plaintiffs in the case at bar differ from those in *Suess* by number (*i.e.,* three), and proximity to the transaction (*i.e.,* signatories to the Agreement) and, consequently, differ in the duty owed to them by the Government.

Defendant also contends that recent precedent "confirm[s] that plaintiffs may not predicate standing in this Court upon the fact that they have invested ... in reliance upon promises made by the Government to the thrift." Def.'s Br. filed Feb. 14, 2001, at 3. In an attempt to prove its point, however, defendant selectively quotes the standing discussion in *Anderson.*[8] A full reading of

---

**8.** While citing *Anderson,* defendant includes the

following quotation: " '[W]hile the court has no

*Anderson* actually supports shareholder-plaintiffs' standing under the circumstances at bar, namely, "where it is clear that the essence of the transaction [was] to provide regulatory incentives to encourage specific investors to capitalize an institution." *Anderson,* 47 Fed.Cl. at 441 (citations omitted).

In addition to lack of precedent supporting defendant's standing arguments, decisions in post-Supreme Court *Winstar* cases with similar facts have found shareholder-plaintiffs to have standing. *See, e.g., Federal-Deposit Insurance Corporation v. United States,* 47 Fed.Cl. 2, 6 (2000) (" 'Shareholder plaintiffs ... have a direct, vested interest in the surplus of potential recoveries and, therefore, have standing to remain as plaintiffs in these actions ....' ") (quoting *Plaintiffs in All Winstar–Related Cases at the Court v. United States,* 44 Fed.Cl. 3, 10 (1999)); *Bluebonnet Savings Bank, F.S.B. v. United States,* 43 Fed.Cl. 69, 74 (1999) ("Here, however, while defendant owed duties to [the thrift], it also owed duties to [plaintiffs]; the fact that these duties overlap does not mean that they are not also owed directly to [plaintiffs]."); *Castle v. United States,* 42 Fed.Cl. 859, 866 (1999) ("It was for the investors' benefit, to induce their investments, that the government made its promises."); *cf. First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (1999) ("Only Dollar entered into the Amended Agreement with the FDIC—not Dollar's shareholders. Thus, First Hartford and other similarly situated shareholders lacked privity of contract with the government.").

Finally, defendant contends that shareholder-plaintiffs lack standing to assert a direct claim based on the language of the Agreement. Defendant relies on section 29, entitled "Limitations With Respect to Investors" (the "Limitation Section" or "section 29"), which establishes shareholder-plaintiffs' potential liability and duties. According to

defendant, because this Agreement—apparently unlike the other *Winstar*-type agreements—contains a section limiting investor liability, *see Hans[e]n* Tr. at 41–42, shareholder-plaintiffs' entitlement to damages is also limited or non-existent.

■ The court's examination of any contract provision begins with the plain language used by the parties. *See Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998); *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir. 1993). When the contract language is unambiguous, the court's inquiry is at an end and the plain language of the contract is controlling. *See Textron Defense Sys.,* 143 F.3d at 1469. Section 29 reads:

> The INVESTORS have executed this Agreement solely to the extent of their covenants provided in §§ 15, 16(a), (c), (d) and (e) and in connection with their obligations under §§ 2(b)(5), 7, 8, 19, 21(c) and 24 and only to the extent of such liabilities that may arise in connection with such provisions.

Due to its choice of words, the scope of the Limitation Section can only be understood in the context of the referenced sections. Section 15, entitled "Covenants of the ACQUIRING ASSOCIATION," obligates Raritan, and shareholder-plaintiffs, among other things, to: administer assets and liabilities (§ 15(a)), satisfy management standards (§ 15(a)(1)), and use their best efforts to pursue potentially recoverable Hammonton claims, as well as related claims which accrue to Raritan (§ 15(a)(2)). Section 16, entitled "Additional Covenants," includes financial covenants relating to both investors' and Bancorp's regulatory capital maintenance, as well as dividend and stock restrictions. In particular, section 16(a)(2) provides that the investors are "jointly and severally liable for any contributions required by this stipulation ...."

doubt that some shareholders may have relied upon the goodwill promise in making their decisions on whether to buy the stock during the public offering, it does not give them a right, as shareholders only, to enforce the contractual terms.' " Def.'s Br. filed Feb. 14, 2001, at 3 (quoting *Anderson,* 47 Fed.Cl. at 441). Not only

is the quotation irrelevant to the present case, as shareholder-plaintiffs did not acquire their stock in a public offering, but, immediately following the sentence quoted by defendant, the court states, "That right, if it exists, belongs to the parties to the contract." *Anderson,* 47 Fed.Cl. at 441.

The Limitations section also references section 2(b)(5), establishing the Hansens' duty to make a $1 million capital contribution to Raritan as a condition of the Agreement. Section 7, entitled "Indemnification for Undisclosed Liabilities, Claims Against the ACQUIRED ASSOCIATION and Litigation Challenging the Merger," provides for FSLIC's indemnification of Raritan for costs associated with litigating a challenge to acquiring Hammonton. Section 8 requires that Raritan use its best efforts to pursue Hammonton's potentially recoverable claims. Section 19 discusses the actions to be taken in the event of a breach by investors, Bancorp, or Raritan. In the event the Agreement is terminated, section 21(c) provides indemnification for Raritan (similar to that described in section 7) for a period of up to five years after termination, provided that Raritan continues to use its best efforts.

Finally, the Limitation section refers to section 24, entitled "Entire Agreement, Severability," which provides that the Agreement, "together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement . . . ." Section 24 further states that "[i]n the event of any conflict, variance or inconsistency between this Agreement and the [Merger Agreement and Plan of Merger], the provisions of this Agreement shall govern . . . ."

■ The contract language is given its ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir.1998). A contract term is unambiguous when there is only one reasonable interpretation. *See Triax Pac., Inc. v. West*, 130 F.3d 1469, 1473 (Fed.Cir. 1997); *A–Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed.Cir. 1994); *see also Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993) (noting that contract is ambiguous where two reasonable interpretations are consistent with contract language). The mere fact that the parties may disagree with regard to the interpretation of a specific provision does not, in and of itself, render that provision ambiguous. *See Community Heating & Plumbing*, 987 F.2d at 1579;

*Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed.Cir.1991).

■ None of the sections cross-referenced in the Limitation Section plainly states that plaintiff is not entitled to sue for defendant's breach of contract. Furthermore, while section 29 discusses investor limitations, it does not change the duties owed to the investors by the Government.

### 2. *The FDIC's standing*

■ Intervenor claims to have standing on the grounds that it is the successor in interest to the rights of Hansen Savings. Intervenor's ownership of Hansen Savings' claims can be traced as follows: After Hansen Savings became insolvent, the Office of Thrift Supervision (the "OTS"), which succeeded the FHLBB, appointed the Resolution Trust Corporation (the "RTC") as receiver for Hansen Savings on January 10, 1992. As receiver the RTC acquired Hansen Savings' claims via statutory authority. *See* 12 U.S.C. §§ 1441a(b)(4), 1821(d)(2)(A) (1994). Also on January 10, 1992, the RTC transferred Hansen Savings' claims to the RTC as conservator for Hansen Federal Savings Association ("Hansen Federal"), a newly chartered mutual association. On April 15, 1994, first the OTS replaced the RTC as conservator of Hansen Federal, with the RTC becoming receiver for purposes of liquidation; and, second, the RTC as receiver for Hansen Federal transferred the claims to the RTC in its corporate capacity. The RTC's sunset provisions took effect on December 31, 1995, extinguishing the RTC. By operation of law, assets held by the RTC in its corporate capacity were transferred to the FSLIC Resolution Fund (the "FRF"), which is managed by the FDIC in its corporate capacity. *See* 12 U.S.C.A. § 1441a(m)(2) (West 1989 & Supp.2000). Thus, the FDIC in its corporate capacity became successor to the assets held by the RTC.

Prior to intervenor's filing in the case at bar, Chief Judge Smith referred the matter of the FDIC's role in *Winstar* litigation to Judge Turner. On March 14, 1997, Judge Turner issued an order governing 43 *Winstar* cases, granting the FDIC's motion to intervene and denying the FDIC's motion to

exclude shareholder-plaintiffs. Judge Turner later issued an opinion discussing the rationale behind the order and stating that "[t]he critical, pivotal fact with respect to the intervention issue is that FDIC, as receiver or fund manager, is the holder of legal title to the claims formerly held by the thrifts." *Plaintiffs in All Winstar–Related Cases at the Court v. United States*, 44 Fed.Cl. 3, 5 (1999) (footnote 4 omitted). The opinion also "concluded that FDIC possesses standing to sue the government as receiver (or fund manager) for failed thrifts and that its intervention as plaintiff would not result in an absence of 'case or controversy.' " *Winstar–Related*, 44 Fed.Cl. at 8–9.

Despite the holding in *Winstar–Related*, defendant argues that intervenor's presence in the instant case "presents an intra-governmental, non-justiciable dispute" because a ruling in favor of intervenor would result in nothing more than a transfer of funds within different branches of the same agency. Def.'s Br. filed Feb. 14, 2001, at 5. During oral argument the court reminded defendant that it had addressed the issue of the FDIC's role in the *Winstar* cases in *Statesman Savings Holding Corp. v. United States*, 41 Fed. Cl. 1 (1998). The court further pointed out that while the court had expressed that it was "frustrated by [the FDIC's] dual identity," [9] *Hans[e]n* Tr. at 48, the court chose to "work within the framework" of Judge Turner's *Winstar–Related* order. *Statesman*, 41 Fed.Cl. at 4 n. 3.[10]

Defendant continued to assert that intervenor's "posture in this case would result in ... a useless academic exercise" and, thinking it needed to expand on this argument, posed two questions to intervenor: 1) "[I]f the FDIC is entirely successful, where would the judgment come from?"; and 2) "where would virtually all of this money go?" *Hans[e]n* Tr. at 49–50. Defendant contended that intervenor could give no other answer than that the money would come from one account in the FRF and go to another and therefore would not satisfy the case or controversy requirement of Article III of the Constitution. The court repeatedly asked defendant to show "any difference at all between the FDIC's role in this case and the FDIC's role in *Statesman* that [the court has] addressed?" *Hans[e]n* Tr. at 52–55. Rather than answer the court's question, defendant continued its attempt to bolster its non-justiciability argument. When defendant eventually responded, it could not provide distinguishing factors between the FDIC's role in *Statesman* and the case at bar.[11] This court in *Statesman* held that the FDIC was the proper successor in interest to the claims of the failed thrift and thus had standing as intervenor to assert liability claims of the failed thrift.[12] *Statesman*, 41 Fed.Cl. at 10–13. Defendant has failed to establish that

**9.** *See Statesman*, 41 Fed.Cl. at 12–13 n. 16 ("This court shares private plaintiffs' dismay at the hydra-headed governmental roles that Congress created for the FDIC and the United States Treasury.").

**10.** Because the opinion in *Winstar–Related*, 44 Fed.Cl. 3, had not yet been published when *Statesman* issued, the court in *Statesman* relied on the Transcript of Proceedings, *Winstar Corp. et al., v. United States*, Nos. 90–8C *et al.*, at 203, 216 (Fed.Cl. Jan. 30, 1997).

**11.** The court's inquiry culminated in the following exchange:

> D: ... And so regardless of whatever they call themselves ... the claim now resides in the FRF. All the money would come out of the FRF and basically back into the FRF.
> The Court: I'll just give it one more try.
> D: I'm sorry.
> The Court.: I resolved that issue in *Statesman*. Is there any material difference between

the role of the FDIC in this case and the role that I reviewed in *Statesman*?
> D: To date, no, Your Honor....

*Hans[e]n* Tr. at 54.

**12.** In *Statesman* the FDIC moved to intervene as both successor to the rights of Statesman Bank and as receiver on the theory that the receivership was entitled to collect for the lost value of Statesman Bank's assets. Only the FDIC's standing to sue on behalf the failed thrift was allowed, and the receivership claim was dismissed. The court reasoned that "[b]ecause any damage suffered as a result of the receivership deficit has been suffered by the FRF, not Statesman Bank, this element of plaintiff FDIC's claim must be dismissed." *Statesman*, 41 Fed.Cl. at 12 (citations omitted). The same holds true for the FDIC in the case at bar. To the extent that the FDIC sues to collect for the receivership deficit in excess of the value of Hansen Savings, that portion of its claim is dismissed.

the instant case requires a different holding.[13]

### 3. Liability

The court and defendant are at odds over the distinction between liability, which is the issue to be decided in the case at bar, and causation, which is reserved for trial. To summarize the liability standard: The *en banc* Federal Circuit held, and the Supreme Court affirmed, that the Government contractually agreed to a particular accounting method for supervisory goodwill. *Winstar*, 518 U.S. 839, 866, 116 S.Ct. 2432 (quoting *Winstar*, 64 F.3d at 1544). However, the enactment of FIRREA prevented the Government from completely performing its contractual promise, at which point the Government became liable for breach. *Winstar*, 518 U.S. at 870, 116 S.Ct. 2432. Applying the *Winstar* liability standard to the instant facts: After the enactment of FIRREA, defendant no longer recognized Hansen Savings' supervisory goodwill as capital, ceased to permit the contractually agreed-upon amortization of the supervisory goodwill over 25 years, and refused to honor the capital forbearance. Affidavit of Jere A. Young, Mar. 10, 1997, ¶ 15. Defendant's action constitutes a breach of the Agreement with shareholder-plaintiffs, and defendant is therefore liable for that breach. Causation factors will not be evaluated until the court decides the degree to which the Government is liable for any resultant harm to the thrift, *i.e.*, makes a damages determination.

Because shareholder-plaintiffs' use of the supervisory goodwill was reinstated, nonetheless, defendant argues that the *Winstar* standard for determining liability should not apply to the present case. Defendant asserts that plaintiffs bear the obligation of establishing a connection between breach and harm, citing *Vermont Agency of Natural Resources v. United States*, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). Once Hansen Savings enjoined the OTS' enforcement of FIRREA, *Hansen Savings*, 758 F.Supp. 240, plaintiffs were able to count supervisory goodwill as capital for "nearly one year before the institution was placed into receivership." Def.'s Br. filed Mar. 16, 2000, at 4. Thus, according to defendant, shareholder-plaintiffs and intervenor must show how the loss of supervisory goodwill, "in and of itself, harmed the thrift, given that the thrift failed even with the goodwill restored ...." Def.'s Br. filed Mar. 16, 2000, at 4.

After the enactment of FIRREA, Hansen Savings was deemed insolvent by December 9, 1989. Plaintiffs aver that this determination "resulted in severe regulatory action against Hansen Savings Bank making it impossible for Hansen Savings Bank to remain profitable ...."[14] Young Aff. ¶ 15. Furthermore, the district court issuing the injunction against the OTS found that "[Hansen Savings had] lost business in the secondary mortgage and construction loan areas, several key employees ... left the bank and [Hansen Savings] ... suffered a loss of public confidence." *Hansen Savings Bank*, 758 F.Supp. at 247. Moreover, although plaintiffs successfully enjoined the enforcement of FIRREA on January 31, 1991, Hansen Savings labored under the burden of FIRREA for more than one year prior to the preliminary injunction. *Id.* Defendant apparently considers that the temporary reinstatement of supervisory goodwill absolved the Government of liability. While an injunction stops future harm, it does not negate liability for what has already been done.

The enactment of FIRREA started a chain reaction of financial woes for shareholder-

---

**13.** Defendant additionally argues that intervenor's claim is barred by the Tucker Act's six-year statute of limitations. 28 U.S.C. § 2501 (1994). The *Statesman* court also addressed this challenge and concluded that the FDIC's claim, the failed thrift's goodwill claim, was "covered by the tolling agreement [between the RTC and the Department of Justice] and is not foreclosed." *Statesman*, 41 Fed.Cl. at 15 (footnote 19 omitted). The court stands by its ruling in *Statesman*.

**14.** For example, FIRREA restricted a savings association's lending to a single borrower to the greater of $550,000.00 or 15% of regulatory capital. Because Hansen Savings could no longer consider the supervisory goodwill as capital, its loan-to-one-borrower limit was reduced. This significantly affected Hansen Savings because it had traditionally relied on loans in excess of $500,000.00 to comprise a large portion of its lending activities. Young Aff. ¶ 15.

plaintiffs and triggered liability for breach of contract on the Government's part, neither of which was eliminated by the preliminary injunction.

## CONCLUSION

The court is cognizant that plaintiffs have been waiting since 1992 for the resolution of their complaint. However, plaintiffs have requested that the court stay further proceedings with the hope that pending appeals to the Federal Circuit regarding damages determinations in similar cases will soon be resolved. The Federal Circuit's review of one damages decision, *Glendale Fed. Bank v. United States*, 43 Fed.Cl. 390 (1999), indicates that reliance damages are more appropriate than restitution damages, rejecting restitutionary damages where the benefit conferred on the Government would be considered. *See Glendale Fed. Bank v. United States*, 239 F.3d 1374 (Fed.Cir.2001). The court remanded the case for a decision on the categories and amount of reliance damages. Plaintiff in *Glendale* did not appeal the trial court's decision that the bank's lost profits (also referred to as expectancy damages) were too speculative. *Glendale*, 239 F.3d at 1378–79.

However, recent Federal Circuit review of *California Federal Bank, FSB v. United States*, 43 Fed.Cl. 445 (1999), affirmed the trial court's denial of restitution damages, but vacated the trial court's denial on summary judgment of lost profits, remanding that issue for trial. *See California Federal Bank v. United States*, 245 F.3d 1342 (Fed. Cir.2001). Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Plaintiffs' and intervenor's motions for partial summary judgment are granted, and defendant's cross-motion is denied. Plaintiffs are entitled to a judgment on liability against defendant consistent with the Supreme Court's decision in *Winstar*.

2. This case is stayed pending further order of the court. Any party may file a status report at any time requesting that proceedings resume.

3. All other pending motions are denied as moot.