**HANSEN BANCORP, INC.,**
**et. al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 92–828C.**

United States Court of Federal Claims.

Aug. 24, 2005.

Richard E. Miller, Philadelphia, PA, for plaintiffs. David L. Braverman, Braverman Daniels Kaskey, of counsel.

William G. Kanellis, Washington, DC, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. Timothy J. Abraham, Scott D. Austin, Melinda Hart, Brian Owsley, and Delisa M. Sanchez, of counsel.

## OPINION

CHRISTINE O.C. MILLER, Judge.

This case is before the court subsequent to trial on remand. *Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297 (Fed.Cir.2004). The United States Court of Appeals for the Federal Circuit issued a mandate directing this court to characterize whether the breach of contract in this case was material. After an exhaustive presentation of evidence by both parties, the individual plaintiffs, while possessive of skilled business acumen, were unable to demonstrate that the breach created by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") constituted a material breach to the contract between plaintiffs and the Government. Instead, Hansen Savings Bank at the time was in a financial position that was not caused by the breach. As a consequence, Hansen Savings Bank would have been subject to the regulations that limited its options to survive even though FIRREA disallowed utilization of the goodwill resulting from the merger that created it to count toward satisfying capital requirements.

## FACTS

### I. *Procedural history*

Three prior judicial dispositions form the prologue for the matter before the court. In *Hansen Bancorp, Inc. v. United States,* 49 Fed.Cl. 168 (2001) (*"Hansen I "*), this court granted plaintiffs' and intervenor's motions for partial summary judgment on liability and denied defendant's cross-motion. The court held that plaintiffs were entitled to a judgment on liability consistent with the Supreme Court's decision in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).[1] Damages issues

---

1. The *"Winstar"* litigation arose from the collapse of the savings and loan industry during the 1980s. Although key aspects of the industry's downfall and Congress's remedial legislation are

were addressed in *Hansen Bancorp, Inc. v. United States*, 53 Fed.Cl. 92 (2002) ("*Hansen II*"). The court, among other determinations, granted plaintiffs' motion for summary judgment on their claim for restitution of their $1 million capital contribution and granted defendant's motion for summary judgment on plaintiffs' claim for expectancy damages and restitution in the form of saved liquidation costs. *Id.* at 111. In an October 4, 2002 order, the court directed entry of judgment and resolved all remaining claims, noting that plaintiffs had withdrawn all non-contract claims. Per the July 26, 2002 order in *Hansen II* and its subsequent amendments, the court ordered entry of judgment for plaintiffs in the amount of $1 million; granted plaintiffs' motion for summary judgment with respect to whether a $1.2 million dividend paid to plaintiffs offset the restitution award; granted defendant's motion for summary judgment with respect to plaintiffs' claims for expectancy damages, for the value of the stock contributed to effect the merger, and for restitution in the form of saved liquidation costs; granted defendant's motion for summary judgment on plaintiffs' claim for restitution of professional fees and miscellaneous expenditures; and granted defendant's motion for summary judgment on plaintiffs' claim for reliance damages measured as losses incurred on certain loans.

Most recently, in *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed.Cir.2004) ("*Hansen III*"), the Federal Circuit concluded that the court erred in *Hansen II* "in ruling on summary judgment that the government's breach of contract was total so as to entitle the Hansens to an award of restitution damages in the amount of $1 million." *Id.* at 1319. The Federal Circuit vacated the court's judgment in favor of plaintiffs and remanded the case for further proceedings to determine if the Government's breach of contract was, in fact, total.[2] *Id.*

## II. *Factual background*

The facts have been published in previous rulings. *See Hansen I*, 49 Fed.Cl. 168; *Hansen II*, 53 Fed.Cl. 92; *Hansen III*, 367 F.3d 1297. They will be recapitulated only to the extent they are germane to the current determination.[3]

discussed in this opinion, the Supreme Court and Federal Circuit have provided extensive explication of the thrift crisis. *See Winstar Corp.*, 518 U.S. at 843–58, 116 S.Ct. 2432; *Anderson v. United States*, 344 F.3d 1343, 1345–47 (Fed.Cir. 2003); *Castle v. United States*, 301 F.3d 1328, 1332–33 (Fed.Cir.2002); *Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1369–71 (Fed.Cir.2001); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1376–77 (Fed.Cir.2001).

2. An order entered on March 14, 2005, limited trial of the breach of contract to a specified time frame:

Trial will explore the actual cause of HSB's inability to make loans. The commencement of the time of the breach will be at least August 1989, and the termination will be December 1990, but only insofar as (1) any restrictions on lending activities are traceable to an analysis of plaintiffs' financial condition as of August 9, 1989–January 1990 and (2) plaintiffs' claim that the restrictions on ability to make loans, or that HSB became insolvent, continued until the later date.

3. Although the court has considered and weighed the testimony of every witness who testified, discussion of each witness in this opinion is not necessary to render a decision. Plaintiffs presented the following fact witnesses: (1) Jere A. Young, President of Hansen Savings Bank ("HSB"), joined Hansen Group in early 1985 and was President of Hansen Financial, an unincorporated business that was part of the Hansen Group and formed to expand Hansen Group into the financial services business; (2) Elmer F. (Bud) Hansen, a real estate developer and founder of the Hansen Group, inclusive later of Hansen Financial, Hansen Bancorp, Inc., and HSB; and (3) James M. Dougherty, currently Senior Vice–President and Chief Financial Officer of Cross Country Bank in Delaware and formerly Chief Financial Officer of Hansen Bancorp beginning in approximately 1988.

For their rebuttal case, plaintiffs called fact witness Angelo A. Vigna, employed by the Federal Home Loan Bank of New York as Senior Executive Vice–President and Director of Agency Functions from 1988–1990; by the Office of Thrift Supervision (the "OTS") as District Director for the New York Region in 1990; and, upon consolidation of regions, by the OTS as the Northeast Regional Director in 1991 or 1992.

Defendant offered the following fact witnesses: (1) Robert J. DuTullio, currently Regional Accountant and Financial Analysis Department Manager for the OTS and formerly the Assistant Director and Regional Accountant for OTS from 1989–92; (2) Michael E. Finn, Regional Director for the OTS's West Region; (3) Allan I. Katz, formerly employed by the Federal Home Loan Bank Board (the "FHLBB") and now employed

Many savings and loan institutions, or thrifts, became insolvent in the 1980s due to rising interest rates. This jeopardized the financial soundness of the Federal Savings and Loan Insurance Corporation ("FSLIC"), which was responsible for reimbursing depositors for their losses. *Hansen III*, 367 F.3d at 1302. In order to minimize the damage to FSLIC, the Federal Home Loan Bank Board (the "FHLBB") sought to have private investors purchase failing institutions in a "supervisory merger" transaction [4] in the expectation that the private investors would rescue, in different ways, the troubled thrift and FSLIC. *Id.* To entice private investors to purchase a failing thrift and assume the liabilities of the institution, the FHLBB allowed the purchasing investor to "allocate any shortfall between liabilities and real assets to an intangible asset known as 'supervisory goodwill.'" *Id.* at 1303. Investors could use this goodwill to meet the acquired thrift's capital requirements, and it could be amortized over a specified period of time.[5] *Id.*

On May 25, 1988, Elmer F. (Bud) Hansen, Jr., and G. Eileen Hansen (the "individual plaintiffs"); Raritan Valley Savings and Loan ("RVSL"); and Hansen Bancorp, Inc. ("Hansen Bancorp") (the individual plaintiffs and Hansen Bancorp are collectively referred to as "plaintiffs"), entered into an Assistance Agreement (the "Assistance Agreement" or the "Agreement") with FSLIC for the purchase of the First Federal Savings and Loan of Hammonton ("Hammonton"), which had become insolvent during the savings and loan crisis of the 1980s. The merger of RVSL and Hammonton resulted in the creation of Hansen Savings Bank ("HSB"), owned by Hansen Bancorp. Hansen Bancorp, in turn, was wholly owned by the individual plaintiffs. *Hansen III*, 367 F.3d at 1303.

The merger of RVSL and Hammonton was encapsulated in a variety of documents: the Assistance Agreement; a May 25, 1988 Forbearance Letter (the "Forbearance Letter") from the FHLBB granting specified forbearances to HSB; FHLBB Resolution No. 88–406 of May 24, 1988 ("FHLBB Resolution"), that approved the supervisory merger of RVSL and Hammonton; and an advisory opinion letter dated September 22, 1988, from accountant KPMG Peat Marwick Main & Co. to the Supervisory Agent of the FHLBB. *Hansen III*, 367 F.3d at 1303.

The Forbearance Letter granted HSB a series of exemptions in connection with the

by the Federal Home Loan Bank of New York as a Senior Examiner and who served as the Examiner–in–Charge of the 1989 OTS Report of Examination of Hansen Savings Bank; (4) Michael L. Simone, currently the Northeast Region's Regional Deputy Director for OTS and formerly a Supervisory Agent and Vice–President of the Federal Home Loan Bank in the relevant 1988–89 time period; and (5) Stephen P. Curran, an OTS federal thrift regulator for the Northeast Region and the Examiner–in–Charge for the 1990 OTS Report of Examination of Hansen Savings Bank.

Defendant's expert in generally accepted accounting principles, purchase accounting, accounting for real estate transactions, accounting for loan loss reserves and related recoveries, calculation of regulatory capital, and generally accepted accounting standards was Thomas E. Randlett, a *certified public accountant and a* director with LECG, LLC, an international firm of consultants, economists, and accountants.

Defendant's expert in financial economics was Dr. Charles C. Cox, a senior vice-president of Lexecon LLC, a consulting firm that specializes in applying economic analysis to legal and regulatory matters, where he designs and supervises research projects and testifies on those projects. Dr. Cox was the Chief Economist at the Securi-

ties and Exchange Commission (the "SEC") from 1982–83 and a Commissioner of the SEC from 1983–87.

Defendant's expert in general management of financial institutions, mortgage banking administration, interest rate risk challenges and strategies, strategic analysis of small and large institutions, management of the interface between institutions and regulators, and the evaluation of financial institutions' financial statements was Fredric J. Forster, sole proprietor of Capital Performance Advisors, a consulting company.

4. A "supervisory merger" transaction is one in which "the regulators provide[ ] direct assistance and other incentives necessary for the healthy thrifts to maintain their financial well-being after the mergers[.]" *Winstar Corp. v. United States*, 64 F.3d 1531, 1535 (Fed.Cir.1995), *aff'd*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Through these mergers, regulators attempted to avoid using FSLIC funds to cover the failing thrift's deposits. *Id.*

5. As demonstrated at trial, two accounting methods were used in the treatment of goodwill: Generally Accepted Accounting Principles ("GAAP") and Regulatory Accounting Principles ("RAP").

merger, including, in specified instances, regulatory capital, equity risk threshold, and liquidity requirements, and the amortization by the straight-line method of unidentifiable intangible assets [6] resulting from the merger over a twenty-five year period. The FHLBB Resolution reiterates the amortization of goodwill by stating that "[t]he value of any unidentifiable intangible assets resulting from accounting for the Merger in accordance with the purchase method may be amortized by [RVSL] over a period not to exceed 25 years by the straight line method from the Effective Date[.]" The Assistance Agreement also required RVSL, as the acquiring association, to "undertake to liquidate each Covered Asset in accordance with the terms of this Agreement prior to applying to [FSLIC] for permission to write down any such Covered Asset's Book Value." [7] Section 3(ii)(a)(1) of the Assistance Agreement, Capital Losses on Covered Assets, provided HSB with capital loss coverage on covered assets above the $5 million that HSB was to absorb. Further, the Agreement mandated that "any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles [ ("GAAP") ] as applied in the savings and loan industry[.]"

The Assistance Agreement required the individual plaintiffs to contribute $1 million to Hansen Savings. Once this and other obligations were met, FSLIC contributed $39.9 million and "an amount equal to [FSLIC's] estimated amount of Net Operating Losses of [Hammonton] from January 1, 1987 to and including March 31, 1988, and one-half of the estimated Net Operating Losses from April 1, 1988 to and including May 18, 1988[ ]" to RVSL. This resulted in a $62 million contribution by FSLIC into Hansen Savings, leaving Hansen with a net liability of $40,485,069. *Hansen III,* 367 F.3d at 1304. According to the Federal Circuit, "[t]he terms of the agreement ... permitted [HSB] to write off the $40 million as 'supervisory goodwill,' amortizing the asset via straight-line depreciation over twenty-five years." *Id.* This amount of goodwill, however, was a primary issue at trial and previously had never been resolved.[8]

Subsequent to the May 25, 1988 merger, on August 9, 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). FIRREA, effective December 7, 1989, eliminated the use of goodwill from the calculation of regulatory capital. Pub.L. No. 101–183, 103 Stat. 188, codified at 12 U.S.C. § 1464(t)(2) (2000). After FIRREA became effective, HSB was unable to use goodwill to meet its capital requirements.[9] Ultimately,

---

**6.** According to Statement of Financial Accounting Standards No. 72 ("FAS 72"), effective September 30, 1982, when "the fair value of liabilities assumed exceeds the fair value of tangible and identified intangible assets acquired," the result is an "unidentified intangible asset." Mr. DuTullio, Regional Accountant and Financial Analysis Department Manager for the OTS, testified that "typically the unidentified intangible asset and goodwill are the same[.]" Transcript of Proceedings, *Hansen Bancorp, Inc. v. United States,* No. 92–828C, at 1230 (Fed.Cl. April 18–29, 2005) ("Tr.").

**7.** Appendix A to the Agreement lists fourteen "covered assets." These assets were holdings of Hammonton prior to the merger that were to be disposed of after the merger by HSB.

**8.** The judgment appealed to the Federal Circuit had not determined the amount of supervisory goodwill. On May 9, 2001, following issuance of its opinion on liability in *Hansen I,* the court granted defendant's motion for reconsideration, stating, in pertinent part:

> Defendant's petition for reconsideration is granted only insofar as to clarify the amount of amortized goodwill discussed in the April 10, 2001 opinion. The opinion stated that the matters to be resolved were limited to "issues relating to the existence of a contract and subsequent breach." *Hansen Bancorp, Inc. v. United States,* 49 Fed.Cl. 168, 172 (2001). The value of goodwill that plaintiffs were entitled to amortize was not deemed a necessary fact for the determination of the existence of a contractual relationship and its subsequent breach. Thus, plaintiffs' and defendant's dispute over the amount of goodwill that plaintiffs were entitled to amortize will be resolved as a factual issue in the trial on damages.

**9.** FIRREA required thrifts to "maintain core capital in an amount not less than 3 percent of the savings association's total assets." 12 U.S.C. § 1464(t)(2)(A). FIRREA excluded unidentifiable intangible assets, such as goodwill, from core capital. *Id.* § 1464(t)(9)(A). *See Winstar Corp.,* 518 U.S. at 857, 116 S.Ct. 2432. Because of the capital requirements imposed by FIRREA, including the exclusion of goodwill from the computation of core capital, an institution "considered solvent in the period prior to FIRREA[ ]"

HSB became insolvent and was placed into receivership on January 10, 1992.

The issue of breach in *Winstar* litigation, as a general matter, was resolved in 1996. *See Winstar Corp.*, 518 U.S. at 870, 116 S.Ct. 2432 ("When the law as to capital requirements changed ... the Government was unable to perform its promise and, therefore, became liable for breach." The Government breached the contracts when "pursuant to the new regulatory capital requirements imposed by FIRREA ... the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating ... net worth."). This court ruled on the matter in *Hansen I* when it found that the Government "no longer recognized Hansen Savings' supervisory goodwill as capital, ceased to permit the contractually agreed-upon amortization of the supervisory goodwill over 25 years, and refused to honor the capital forbearance." *Hansen I*, 49 Fed.Cl. at 177. These actions constituted a breach for which the Government was held liable. *Id.*

The trial and this opinion focus on the effect of the Government's breach on plaintiffs—namely, whether the breach was "total."[10] *See Hansen III*, 367 F.3d at 1319. That issue implicates the related determination of the amount of goodwill actually accorded to HSB as a result of the merger. Plaintiffs assert that HSB was allowed to amortize, and count towards its core capital requirements, approximately $40 million. *See* Pls.' Br. filed Mar. 4, (2005). Defendant contends that the amount of goodwill to be amortized was approximately $20 million because HSB did not amortize FSLIC covered-asset assistance and was required to reduce the amount of supervisory goodwill by the amount of cash assistance received. *See*

Def.'s Br. filed June 2, 2005, at 8–10. Defendant also argues that HSB would have failed to meet its capital requirements regardless of the amount of goodwill amortized. *See id.* at 6–7. Whereas defendant portrayed HSB as moribund, such that implementation of FIRREA's regulatory structures did not precipitate its being put into receivership, the fact is that had HSB been able to amortize $40 million in goodwill, its operations may, or may not, have proved successful. The inability to rely on the full $40 million was the only certainty: Without that ballast HSB failed to meet minimum capital requirements, and HSB's options were curtailed significantly. Therefore, if HSB was entitled to the lesser amount of goodwill, as defendant contends, plaintiffs cannot complain that HSB's operations would not have been subjected to these requirements.

1. *Defendant's understanding of goodwill from the merger*

Key to resolving the amount of goodwill are the parties' individual understandings of the amount of goodwill. In plaintiffs' April 8, 1988 Business Plan of Raritan Valley Savings and Loan Association and First Federal Savings and Loan Association of Hammonton, New Jersey and Hansen Bancorp, Inc. (the "1988 Business Plan"), plaintiffs listed approximately $13 million[11] in goodwill for the end of the first quarter of 1988. Comparatively, plaintiffs listed approximately $22 million of "Impaired Assets" in the projected asset structure of RVSL and Hammonton as of the time of the merger.[12] The difference between the value of goodwill and covered assets is seen in the 1988 Business Plan on a schedule of the amortization for goodwill,

could immediately be rendered insolvent after FIRREA's enactment, though its assets and liabilities remained the same." *Hansen III*, 367 F.3d at 1304 n. 4.

10. The terms "total breach" and "material breach" are used interchangeably and signify the same type of breach. *See Hansen II*, 53 Fed.Cl. at 100 ("The term 'total breach' is not a term of art. Awards of restitution are often predicated on findings of 'substantial' or 'essential' breach, as well.").

11. This amount corresponds to HSB's initial reporting of $34 million in goodwill, as reflected in

the September 22, 1988 accountant's letter from KPMG, after FSLIC covered-asset assistance of between approximately $18.9 and $21.6 million is factored into the goodwill amount.

12. Defendant established at trial that "Impaired Assets" were covered assets. As Mr. Young, President of HSB, testified, the reference to "Impaired Assets" "represents FSLIC assistance on the impaired assets, [and] it would seem to tie the impaired assets into covered assets[.]" Tr. at 407.

where it is noted that the schedule "does not include the non-amortizing identified intangible asset[s] represented by estimated FSLIC assistance on the impaired assets."

The significance of these recordations of the amount of goodwill and covered assets is important because, according to Statement of Financial Accounting Standards No. 72 ("FAS 72"), "[i]f receipt of the assistance is not probable or the amount is not reasonably estimable, any assistance subsequently recognized in the financial statements shall be reported as a reduction of the unidentifiable intangible asset .... Subsequent amortization shall be adjusted proportionally." Hence, this provision indicates that goodwill should have been reduced as FSLIC assistance was received.

Plaintiffs' understanding of goodwill was again on display in the CPA Audit Report of December 31, 1988(HSB). In this report HSB listed $21.6 million in goodwill (unidentified intangible assets) and $18.9 million as FSLIC covered-asset assistance (a non-amortizing asset). Notably, HSB explained the relationship of these two amounts in the section of "Ownership, Acquisitions, and Dispositions[,]" where they stated that "[a]fter consideration of FSLIC assistance of approximately $18,900,000, the fair value of the liabilities assumed exceeded the fair value of assets acquired by approximately $21,600,000." A caveat in the auditor's report noted FSLIC's troubled circumstances: "[T]he ultimate recovery of [the covered assets] is uncertain and dependent upon the ability of the FSLIC to perform under its obligation and guarantees." Robert J. DuTullio, Regional Accountant and Financial Analysis Department Manager for the OTS,

downplayed the significance of this language in the report and categorized it as an "emphasis in matter paragraph." Transcript of Proceedings, *Hansen Bancorp, Inc. v. United States*, No. 92–828C, at 1388 (Fed.Cl. April 18–29, 2005) ("Tr."). According to Mr. DuTullio, who served as the self-described "accounting expert" to OTS examiners, Tr. at 1208, the issue "wasn't enough for [the auditors] to qualify their opinion. They still issued a clean opinion. It wasn't enough for them to combine the 18.9 and the 21.[13] They still bifurcated that. It wasn't enough for them to question the entity's ability to continue as a going concern." Tr. at 1389.

Subsequently, a February 1989 Report of Examination (the "1989 ROE")[14] reiterated the accounting forbearances plaintiffs received from the merger. This report also indicated a separation of non-amortizing goodwill, or FSLIC assistance, and amortizing goodwill, or unidentified intangible assets. In the same vein, Thomas E. Randlett, defendant's accounting expert, testified persuasively that HSB amortized $21.6 million of goodwill based on a later Thrift Financial Report ("TFR")[15] for December 1989.[16] This TFR undercuts plaintiffs' assertion that HSB was allowed to amortize approximately $40 million in goodwill.

The 1989 ROE also catalogues HSB's struggles that defendant claims were not associated with the breach. According to Michael L. Simone, a Supervisory Agent and Vice–President of the Federal Home Loan Bank in the 1988–89 time period, the 1989 ROE indicates "that [HSB] was not following basic loan underwriting practices, which goes to the crux of what a savings and loan associ-

13. In other words, a demarcation still was made between the value of goodwill and the value of the covered assets. This discussion demonstrated the distinction between these values and shows that plaintiffs were aware of their separate treatment.

14. According to Allan I. Katz, who has worked for the FHLBB, the Federal Home Loan Bank of New York, and the OTS as a Senior Examiner, and who was the Examiner–in–Charge of the 1989 ROE, "the purpose [of the ROE] is to review the institution's financial condition, make sure it's operating in a safe and sound condition, not a threat to the insurance fund, make sure it's in compliance with outstanding regulations, fol-

low up anything from the prior examination that needed [resolution]." Tr. at 1630.

15. According to Mr. Dougherty, the former Chief Financial Officer of Hansen Bancorp and HSB, a TFR is "supposed to list the assets and liabilities of the bank, and the income if you go further back, in accordance with specifically required or designated categories by the regulators." Tr. at 623.

16. On October 10, 1989, HSB sent FHLBB a letter indicating that HSB had $13 million of Hammonton intangible assets remaining.

ation is all about." Tr. at 1731. Mr. Simone explained that the 1989 ROE's discussion of "material underwriting deficiencies" referred to that fact that

> [i]t appeared that the institution was lending money to entities and to individuals without having basic loan underwriting documentation. They were obtaining financial statements and so forth from borrowers, but they were not verifying the information or the documents that they were receiving.
>
> They were accepting appraisals, but those appraisals lacked substantive information to support the value of the appraisal. And in some cases, the rates and other information used in the appraisals possibly overstated those appraisals.
>
> So it appeared, based on the examination findings, that the lending was done more in anticipation that the value of the properties years out would be worth more than they are today, not anticipating any loss in value over time.

Tr. at 1731–32. The 1989 ROE did not criticize underwriting for the merger. Instead, the ROE attributed these problems to "underwriting being done by Hansen representatives in the Hansen institution itself." Tr. at 1732.

HSB's difficulties culminated in an October 10, 1989 OTS letter to HSB ordering HSB to stop multifamily and commercial real estate lending because HSB had underwriting and asset clarification problems. OTS informed HSB that this prohibition would remain "until revised underwriting policies and procedures are adopted by the board and found to be acceptable[.]"

Another document supporting defendant's position as to how HSB accounted for goodwill, including the use of FSLIC covered-asset assistance, is HSB's January 8, 1990 Capital Plan, which shows that HSB calculated $19.5 million in goodwill. Prepared by HSB itself, the Capital Plan notes that "[i]n connection with the acquisition merger of [Hammonton], HSB created approximately $40 million of supervisory goodwill, which included the excess of [Hammonton's] liabilities over its existing assets *and the expected future recovery from the sale of assets guar-*

*anteed by the FSLIC.*" (Emphasis added.) The Capital Plan also states that HSB had between a $39–$53 million capital deficiency at breach and that FSLIC assistance on covered assets was guaranteed. Because HSB was capitally deficient between $39–$53 million at the time of the breach, defendant contends that plaintiffs' claim that the breach phased out $36.8 million in supervisory goodwill, Pls.' Br. filed Mar. 4, 2005, at 12, is "immaterial to HSB because HSB was far out of capital compliance even including this amount in its regulatory capital calculation[,]" Def.'s Br. filed June 2, 2005, at 7.

The October 1990 Report of Examination (the "1990 ROE"), issued in April 1991 by the OTS, illuminates HSB's difficulties. According to this report and Michael E. Finn, Regional Director for OTS's West Region, HSB had a $30 million capital deficit when Hammonton intangibles were added to HSB's capital. As Mr. Finn testified, "[t]he tangible capital level, including the add-back of the goodwill, would have been negative $21.7 million. But that would only represent the level. The minimum requirement would have been $8.4 million, for a net capital deficiency of $30.1 million." Tr. at 1479.

HSB received a "MACRO" rating of 5 in the 1990 ROE. A MACRO rating evaluates an institution's Management, Asset Quality, Capital, Risk Management, Operating Results, as well as miscellaneous items. The lowest possible score, a MACRO rating of 5 "is reserved for institutions with an extremely high immediate or near-term probability of failure. The volume and character of weaknesses are such as to require urgent aid from the shareholders or other sources."

The 1990 ROE also restated HSB's interpretation of *Hansen Sav. Bank v. Office of Thrift Supervision,* 758 F.Supp. 240 (D.N.J. 1991), the January 31, 1991 United States District Court of New Jersey decision as preliminarily enjoining OTS from "excluding [HSB's] supervisory goodwill from capital calculations for all regulatory purposes." According to Stephen P. Curran, a federal thrift regulator for the OTS in the Northeast Region who was the Examiner–in–Charge for the 1990 ROE, the reference to "FSLIC

receivable" "refer[s] to the approximately $18.9 million that, combined with the [$]21.6 million of true supervisory goodwill, arrives at the approximately [$]40.5 million that [HSB] uses in its interpretation of giving effect to the court ruling." Tr. at 1844. At the heart of the matter, Mr. Curran agreed that, although he interpreted the ruling as covering the full $40.5 million, that the $40.5 is separated into the $18.9 million FSLIC receivable, which is treated as a non-amortizing asset, and the $21.6 million in supervisory goodwill, which is an amortizing asset.

Related to the 1990 ROE is an April 23, 1991 memorandum from William L. Pollack, Review Examiner, to Nicholas J. Ketcha, Jr., Regional Director, concerning the capital situation of HSB. This memorandum presented a conflict with the 1990 ROE that Mr. Curran could not explain. Notably, Mr. Curran could not reconcile his capital analysis in the 1990 ROE, in which he found HSB "in a capital deficit situation[,]" Tr. at 1846, with the April 23, 1991 memorandum that found that HSB's tangible capital exceeded eight percent.

HSB's MACRO rating of 5 from the 1990 ROE subjected it to RB3a–1, a regulatory bulletin that provided guidance to OTS in the handling, according to Mr. Finn, of the "growth at a group of institutions ... that exhibited certain characteristics." Tr. at 1453. For an institution that received a MACRO 4 or 5 rating, RB3a–1 limited the institution to a total amount of net interest credited [17] and, if insolvent, required the institution to "make a request to the OTS for the types of activity [the institution] want[ed] to engage in." Tr. at 1454.

By notice dated February 2, 1990, the OTS deemed HSB insolvent and "directed [HSB] not to make any new loans or investments without the prior written approval of the District Director." Mr. Young, President of HSB, and Hansen Financial Group's "primary decisionmaker," Tr. at 263, testified that prior to August 9, 1989, the date FIRREA was enacted, HSB had never been informed that it was insolvent. These restric-

tions resulted in HSB's having to submit individual requests for authority to make various loans. As an example of the difficulties that this process caused HSB, Mr. Young referenced an April 6, 1990 letter from Angelo A. Vigna, a District Director for the New York Region of OTS at this time, that allowed HSB to make student, home equity, unsecured personal credit, and automobile loans for specified amounts. Mr. Young testified that "it was generally less than a month, less than 30 days we would have used up all of our capacity in either numbers [of loans allotted] or dollars and have to go back and get another authority." Tr. at 204–05. Plaintiffs contend that these requests and this method of conducting business was brought about due to the Government's breach, whereas defendant asserts that HSB was already in a dire condition that warranted this type of restriction regardless of the breach.

Finally, on April 1, 1991, an OTS Interoffice Memorandum discusses OTS's response to HSB's assertion that FSLIC covered-asset assistance was part of goodwill. The Memorandum notes that HSB represented its goodwill to be approximately $40 million. It states that "[i]ncluded in that number, however, was an amount that would be returned to [HSB] under asset coverage provided by FSLIC." This Memorandum references the New Jersey federal district court's decision in *Hansen Sav. Bank,* 758 F.Supp. 240. Mr. DuTullio testified as to OTS's and his understanding of this ruling and the impact of FIRREA:

> Well, in my mind, then and today, is that the only thing that FIRREA affected was supervisory goodwill, or unidentified intangible asset, and whatever you call the other asset, whether it's identifiable or nonamortizing goodwill or FSLIC receivable, it had nothing to do with FIRREA. So ... the court decision should have nothing to do with that.

Tr. at 1263. Hence, Mr. DuTullio evinced the Government's position that covered-asset

---

**17.** "Net interest credited" "generally represents the amount of interest that is being credited on

deposit liability accounts." Tr. at 1454.

assistance did not constitute amortizable goodwill.

### 2. *Plaintiffs' understanding of goodwill from the merger*

Plaintiffs attempted to demonstrate that HSB counted goodwill as approximately $40 million. The September 22, 1988 accountant's letter from KPMG lists approximately $34 million in goodwill.[18] HSB's goodwill was also set forth in the December 31, 1988 CPA Audit Report for HSB. Unfortunately for plaintiffs, however, this listing of goodwill begins to illuminate what defendant claimed throughout trial: FSLIC covered-asset assistance was considered separate and apart from goodwill. Specifically, $21.6 million was listed in goodwill and $18.9 million was listed as FSLIC covered-asset assistance. As noted above, plaintiffs explained the relationship of these two numbers, and it was clear that FSLIC assistance and goodwill were separate items.

Plaintiffs further rely on the December 31, 1990 and 1989 Consolidated Financial Statements that note that "the FHLBB and FSLIC granted certain rights to the Bank to amortize the $40,485,000 in supervisory goodwill."[19] In its answer to HSB's October 16, 1990 complaint filed in federal district court in New Jersey, OTS admitted that, based on the September 22, 1988 letter from KPMG "the FHLBB did not object to Hansen's calculation of $40,485,069 as the amount of supervisory goodwill created by the merger." Answer of Defendants Office of Thrift Supervision and T. Timothy Ryan, Jr., Director of the Office of Thrift Supervision, and Counterclaim of Director of the Office of Thrift Supervision, filed in *Hansen Sav. Bank v. Office of Thrift Supervision*, No. 90–4092 (D.N.J. Mar. [ ], 1991), ¶ 35. Moreover, on cross-examination, plaintiffs' counsel elicited from Mr. DuTullio that the regulators made no objection to the initial calculation of good-

will in the September 22, 1988 letter from KPMG.

Plaintiffs relied on the December 1988 and March 1989 TFRs to support their assertion that HSB was entitled to $40 million in goodwill. Mr. Dougherty described the approximately $37 million of goodwill listed on the December 1988 TFR as "goodwill plus . . . other intangible assets that may have existed at the bank at the time." Tr. at 624. The increase to $41 million in goodwill on the March 1989 TFR is attributable to the look-back period that prescribed an adjustment for errors and increased the goodwill amount. Plaintiffs contend that, after these reports, "the regulators instructed HSB to reduce its [Regulatory Accounting Principles ("RAP") ] goodwill by the amount it received from FSLIC for covered asset losses under the Assistance Agreement[,]" even though this was in violation of the merger agreement. Pls.' Br. filed May 24, 2005, at 6. Plaintiffs assert that this accounting was consistent with KPMG's determination and that treatment of such goodwill as assistance was proper. *Id.*

Informative to plaintiffs' understanding of its goodwill-cum-assistance calculation is Mr. Dougherty's testimony regarding the treatment of goodwill and FSLIC covered-asset assistance. According to Mr. Dougherty,

> The covered assets were accounted for in essence by marking to market their fair market value as could best be determined at the time of the acquisition. . . . [I]n order to sell an asset, you had to have FSLIC agreement or approval, in essence, to dispose of an asset. . . . [Y]ou had no idea whether or not they were going to agree to it, and then you had no idea what the impact of having to get FSLIC approval to dispose of an asset would have on the ultimate sale price of the asset.
>
> . . . .

---

18. This was the initial amount of goodwill calculated from the merger. Based on the mandated one-year look-back period reflected in the CPA Audit Report of December 31, 1988, the amount of goodwill was revised from $34 million to approximately $40 million.

19. A similar report for December 31, 1989 and 1988 produced by KPMG also states that "the FHLBB and FSLIC granted certain rights to [HSB] to amortize the $40,485,000 in supervisory goodwill, resulting from the merger . . . over a 25–year period based upon the straight-line method[.]"

So you could never determine how much money you were really going to get from FSLIC. It was—that's why you couldn't estimate the number and then in light of the condition that the FSLIC was in, it wasn't probable that they would be able to pay it or not pay it.

Tr. at 641–43. Without directly attributing his understanding to FAS 72, Mr. Dougherty's testimony mirrors FAS 72's requirement that goodwill be reduced by FSLIC assistance.

### III. *Defendant's relitigation of breach of contract claims*

Defendant makes a troubling argument in its latest attempt to eradicate plaintiffs' claims from the *Winstar* landscape. It is the timing of the argument that concerns the court. After defendant had a full and fair opportunity to litigate the issue of breach of contract, liability was resolved against the Government in 2001, including the Government's refusal to honor the capital forbearance. *See Hansen I,* 49 Fed.Cl. at 177. *Hansen I* took occasion to list all of the defenses to liability that defendant had raised and argued: The *Winstar* holding did not encompass the acquisition of a solvent thrift that had merged with both a troubled thrift and a solvent out-of-state thrift; the shareholder plaintiffs lacked standing to sue; and the assistance agreement limited investor liability in such a manner as to affect the duties owed to the investors by the government. *See Hansen I,* 49 Fed.Cl. at 172–73. After *Hansen III* issued in 2004 and before the 2005 trial, defendant began pressing the argument that the May 25, 1988 Forbearance Letter did not constitute a promise within the rubric of the *Winstar* commitment to forbear for a period of years to enforce regulatory capital requirements.

The Forbearance Letter provides in paragraph (4):

For a period of five (5) years following the Effective Date, the Board will forbear from enforcement of the reserve or regula-

tory capital requirements as stated in Insurance Regulation 563.13 *provided that the Board may lawfully forbear* with respect to such requirements, and provided further that failure to meet the requirements is due to (1)(a) operating losses on acquired assets; (b) capital losses sustained by RVSL upon disposition of acquired assets; (c) acquired assets that are scheduled items or become assets classified as Doubtful, Substandard or Loss pursuant to Sections 561.16c, 563.17–2, and 571.1a; and (d) the assumption of Hammonton's liabilities, including averaged liabilities; or (2) [RVSL] assumption of Hammonton's regulatory capital deficiency as of the Effective Date.

(Emphasis added.)

Defendant argues that this explicit language expresses the parties' mutual understanding that the Government was relieved of honoring this forbearance if applicable laws and regulations changed. *See Hometown Fin., Inc. v. United States,* 409 F.3d 1360 (Fed.Cir.2005). The Federal Circuit in *Hometown* recognized that a similar provision in a forbearance letter "clearly sets forth the understanding of the parties that regulatory change was possible because it refers to calculating the [regulatory capital] requirement in accordance with 'any successor regulation.'" *Id.* at 1367–68. However, a proviso excepted the five-year period following consummation of the acquisition, during which the regulatory capital requirement was required to take into account the forbearances granted. *Id.* at 1368; *cf. Admiral Fin. Corp. v. United States,* 378 F.3d 1336, 1339–43 (Fed.Cir.2004) (holding that contract uniformly placed risk of regulatory change on plaintiff); *Guar. Fin. Servs., Inc. v. Ryan,* 928 F.2d 994, 999–1000 (11th Cir.1991) (construing same language followed by Federal Circuit in *Admiral* ). In the case at bar, the forbearance granted by the FHLBB is limited—both temporally and substantively—but not that of FSLIC.[20] Apparently, this case

---

**20.** Paragraph (1) of the Forbearance Letter states:

The FSLIC will forbear, for a period not to exceed five (5) years following the date of the consummation of the merger ("Effective

Date"), from exercising its authority, under Section 563.13 of the Rules and Regulations for Insurance of Accounts, for any failure of RVSL, to meet the regulatory capital requirements of Section 563.13 arising solely from

also is unique in that FSLIC agreed to shift the risk of regulatory change, whereas the FHLBB did not. The court does not opine about the legal consequences of this inconsistent treatment by the two cognizant agencies.

The court has determined that this defense to liability should not be honored because it comes too late. Something is fundamentally askew in the litigative process when a trial court is required to review yellowing filings—not evidence—in order to rule whether a party timely has made an argument. The decrepit filing, Response to Plaintiffs' Memorandum in Support of Proposed Order on Partial Summary Judgment, filed April 29, 1998, argues in a spirited fashion that the existence of a contract cannot be resolved in this case based on a template that was being applied to other *Winstar* cases due to factual vagaries in this case—involving causation, in particular. Absent from the recital of these distinguishing facts, however, is any special provision in the Forbearance Letter. In fact, defendant concedes that the case at bar is the only extant contract with such a provision (the other cases having "been fully resolved through voluntary dismissal"). *See* Def.'s Br. filed May 27, 2005, at 2 n. 2.

Defendant cannot claim plausibly that the Forbearance Letter, a government document, was not available to it before this court issued its decision on liability, so that its insistence to the prior judge that it could not defend without discovery is not germane to the timing of its newest defense.[21] Nor can defendant claim that liability is an evolutionary process that is not resolved finally against the Government until judgment enters. While RCFC 54(c) contemplates that a court can revise an order at any time prior to judgment, this provision does not afford a party a right to relitigate matters. Defendant may have succeeded in revisiting the

(1)(a) any increase in the contingency factor attributable to the assets of Hammonton existing at the Effective Date, and, (b) any increase in the net growth of RVSL as of the Effective Date by reason of RVSL's assumption of Hammonton's liabilities; *or* (2) RVSL's assumption of the regulatory capital deficiency of Hammonton as of the Effective Date.

determination that the Government breached the contract insofar as whether the breach should be deemed material, but the court will not aid and abet this practice by ruling on defendant's most recent attempt to defeat liability. At some point the issue must be not whether the Government should be allowed to raise arguments as guardian of the fisc, but whether the Government is entitled to grind plaintiffs down.

## DISCUSSION

### I. *The issue on remand*

■ Plaintiffs seek restitution damages for the Government's breach of contract. The purpose of restitution damages is to "restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001). Restitution damages are only available "if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach." Restatement (Second) of Contracts § 373 cmt. a (1981) (hereafter "Restatement").

■ A total breach[22] is one that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Id.* § 243(4). The Federal Circuit requires "that the breach 'must be of a relatively high degree of importance.'" *Hansen III*, 367 F.3d at 1312 (quoting George E. Palmer, The Law of Restitution § 4.5 (1978)). Drawing from the Restatement, the Federal Circuit set forth five circumstances that are significant in determining whether a breach is total, or material:

21. The Government noted this possible defense in opposing the 1990 injunctive action brought by plaintiffs. *See* Defendants FDIC's and OTS's Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed in *Hansen Sav. Bank*, No. 90–4092, at 33 n. 28 (D.N.J.[undated]).

22. *See supra* note 10.

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement § 241; *see Hansen III*, 367 F.3d at 1312. While discounting the importance of the third circumstance, the court stated that the first "will always be a pertinent consideration." *Id.*

With respect to HSB, defendant argues that the breach is not total, so as to "so substantially impair[ ] the value of the contract to" plaintiffs, because HSB was already in a parlous capital position at the time of breach. Defendant rejects the proposition that HSB's capital deficiency was related to or caused by the breach. Plaintiffs assert that they not only expected approximately $40 million in goodwill from the merger of RVSL and Hammonton, but that, throughout the brief trajectory of their stewardship, HSB accounted for $40 million of goodwill. With the full $40 million of goodwill, HSB would have been capitally compliant. HSB's capital compliance was affected when FIR-REA was enacted because of the phaseout of this goodwill. Hence, two points of contention are manifested: Defendant maintains that HSB already was capital deficient prior to the breach, while plaintiffs attribute HSB's capital deficiency to the breach. The amount of goodwill to which plaintiffs were entitled frames the debate. Plaintiffs argue that HSB was to receive $40 million in goodwill, whereas defendant sets the amount of goodwill at approximately $20 million due to

the reduction in goodwill from FSLIC cash assistance.

Defendant maintains that HSB was so far out of capital compliance by the end of 1989 that the remaining amount of unamortized goodwill was insufficient to render HSB capital compliant. HSB stated that the aggregate deficiency under FIRREA's tangible and core capital standards was $39.2 million. The Summary Schedule of Capital Requirements and Attainment by Quarter, submitted on January 8, 1990, reflects the following:

### B. SUMMARY SCHEDULE OF CAPITAL REQUIREMENTS AND ATTAINMENT BY QUARTER

| (Dollar Amounts in Thousands) For the Month Ended: | 1989 NOV |
|---|---|

**SUMMARY OF CAPITAL POSITION:**

| | |
|---|---|
| Required Tangible Capital | $ 9,030 |
| Estimated Tangible Capital | ( 30,205) |
| Excess (Short-fall) | ($39,235) |
| Required Core Capital | $18,075 |
| Estimated Core Capital | ( 21,168) |
| Excess (Short-fall) | ($39,243) |
| Required Total Capital | $31,869 |
| Estimated Total Capital | ( 21,168) |
| Excess (Short-fall) | ($53,037) |

(Footnote omitted.) Whether the shortfall is viewed as $39 million or $53 million, restoration of the unamortized goodwill in the higher amount claimed by plaintiffs would not have rendered HSB in capital compliance. Mr. DuTullio confirmed this analysis, and Mr. Dougherty could not explain it away convincingly by intoning plaintiffs' theme that HSB was forced to render all its accounting to FSLIC using GAAP methods, rather than RAP.

## II. *Material breach*

The issues of material breach, or total breach, and the appropriateness of restitution as a remedy evolved separately in the jurisprudence of the United States Court of Claims and the United States Court of Appeals for the Federal Circuit until the *Winstar* litigation. Traditionally material breach

has been viewed as a means to excuse future performance, rather than to determine whether restitutionary damages ought to be awarded. The subtext is that defendant in this case was permitted two bites of the litigative apple, and this court was inadvertently complicit when it permitted defendant, after having lost the issue of liability, *i.e.,* having the issue of liability resolved against the Government, to raise the issue of material breach in the context of challenging plaintiffs' damages theories. Plaintiffs have litigated through two dispositive motions and one trial and face a contemplated trial on damages, *i.e.,* whether the amount of restitution claimed is accurate, if the court concludes that the breach was material. Plaintiffs have been required to sustain enormous legal fees, and the corresponding dedication of their counsel has been tested, in pursuing a conclusion to this litigation. Were the issue one of fundamental fairness, the judgment would not be in the Government's favor.

It may well be that the vogue for measuring a *Winstar* plaintiff's ability to obtain restitution by material breach was adopted by default in order to provide a justification for awarding restitution, an equitable measure of damages, in the absence of jurisdiction over matters sounding in equity. But that is no excuse to torture a remedy for excusing performance by an aggrieved party into a sword used by the Government to avoid paying the only measure of damages (and the lowest) available in this case.

### 1. *Roots of doctrine*

Following the guidance of the United States Supreme Court, the United States Court of Claims applied the doctrine of material breach mainly for the purpose of excusing either future performance of a contract or a subsequent material breach. For example, in *David J. Joseph Co. v. United States,* 113 Ct.Cl. 3, 82 F.Supp. 345, 350–51 (1949), the Court of Claims cited and analogized to two Supreme Court cases to support its ruling. The first case, *Hinckley v. Pittsburgh Bessemer Steel Co.,* 121 U.S. 264, 7 S.Ct. 875,

30 L.Ed. 967 (1887), involved a contract for the sale of steel rails. The defendant was to provide drilling directions for the manufacture of the rails. The defendant materially breached the contract by continuously delaying giving the contractor the instructions required to perform, until finally the defendant arranged to purchase the rails from another manufacturer at a lower price. The Supreme Court upheld the ruling "that the defendant, by requesting the plaintiff to postpone the delivery of the rails, and by notifying the plaintiff that he was not ready to accept and pay for them, excused the plaintiff from actually manufacturing them and tendering them to the defendant." *Hinckley,* 121 U.S. at 273, 7 S.Ct. 875. As such, "the defendant must be held liable in damages." *Id.* The second Supreme Court case discussed by the *David J. Joseph* court was *United States v. Speed,* 75 U.S. (8 Wall.) 77, 19 L.Ed. 449, 7 Ct.Cl. 93 (1869). The issue in *Speed* was the measure of damages for a breach by the Government for failure to furnish and pay for the slaughter of a full complement of 50,000 hogs.[23] The Supreme Court affirmed the judgment for the contractor by stating:

> [W]here, as in this case, the obligation of plaintiffs requires an expenditure of a large sum in preparation to enable them to perform it, and a continuous readiness to perform, the law implies a duty in the other party to do whatever is necessary for him to do to enable plaintiffs to comply with their promise or covenant.

*Id.* at 84. Drawing on these Supreme Court precedents, the Court of Claims held the Government liable for repudiation of a contract through no fault on part of the plaintiff, thus excusing the plaintiff of any obligations under the contract. The *David J. Joseph* court noted that " '[i]t is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure.' " 82 F.Supp. at 350 (quoting 3 Williston on Contracts, § 677, p. ___ (___ ed.1922)). The Fed-

---

**23.** Interestingly, the damages included lost profits. As the case involved neither restitution nor a material breach, the Court of Claims relied on it as acknowledging the principle that a non-breaching party is eligible for a measure of relief that will make it whole under the circumstances.

eral Circuit has recently clarified the material breach doctrine:

> Under [the] doctrine [of prior material breach], when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach. Faced with two parties to a contract, each of whom claims breach by the other, courts will "often ... impose liability on the party that committed the first material breach."

*Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1380 (Fed.Cir.2004) (citations omitted).

Other cases involving material breach before the Court of Claims also turned upon whether a material breach excused performance. *See e.g., Southeastern Airways Corp. v. United States,* 230 Ct.Cl. 47, 673 F.2d 368 (1982) (explaining Government rightfully terminated contract for contractor's material breach because contractor failed to show Government caused breach); *Arlington Alliance, Ltd. v. United States,* 231 Ct.Cl. 347, 685 F.2d 1353 (1982) (finding contractor wrongfully terminated contract because Government's breach not material); *Allan Const. Co. v. United States,* 227 Ct.Cl. 193, 646 F.2d 487 (1981) (not allowing contractor to win quantum meruit on losing contract because Government did not materially breach, thereby requiring contractor to continue performance under contract); *Burroughs Corp. v. United States,* 225 Ct.Cl. 63, 634 F.2d 516 (1980) (not excusing Government's material breach because contractor's prior breach found not material); *Litchfield Mfg. Corp. v. United States,* 167 Ct.Cl. 604, 338 F.2d 94 (1964) (excusing contractor from performing contract where Government materially breached by failing to deliver equipment essential to contractor's performance); *Pa. Exch. Bank v. United States,* 145 Ct.Cl. 216, 170 F.Supp. 629 (1959) (holding contractor liable for total, or material, breach, thus excusing Government from payment of contract price).

The Federal Circuit followed this rationale in applying the material breach doctrine. *See, e.g., Christopher Vill., L.P. v. United States,* 360 F.3d 1319, 1337 (Fed.Cir.2004) (finding contractor's fraudulent conduct, as a prior material breach, rightfully was used as defense to Government's subsequent breach [24]); *Dow Chem. Co. v. United States,* 226 F.3d 1334, 1346 (Fed.Cir.2000) (holding Government's repudiation of license gave patentee right to terminate license [25]); *Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260 (Fed.Cir.1999) (explaining contractor obligated to adhere to contract's dispute clause because Government's breach was not material [26]); *Gibson v. Dep't of Veterans Affairs,* 160 F.3d 722, 727 (Fed.Cir.1998) (justifying termination of employment after employee's material breach of "last chance" employment agreement); *Thomas v. Dep't of Housing and Urban Dev.,* 124 F.3d 1439, 1442 (Fed.Cir.1997) (deciding employer materially breached settlement agreement thereby excusing employee from adhering to terms of agreement); *Tretchick v. Dep't of Transp.,* 109 F.3d 749, 753 (Fed.Cir.1997) (finding employer's breach of settlement agreement did not amount to material breach that would excuse employee's performance under agreement); *Stone Forest Indus. v. United States,* 973 F.2d 1548, 1551–52 (Fed.Cir.1992) (acknowledging Government's prior material breach excused contractor's subsequent breach of contract); *Malone v. United States,* 849 F.2d 1441, 1445–46 (Fed.Cir.1988) (not obligating contractor to proceed with performance after Government's material breach); *Sun Studs, Inc. v. ATA Equip. Leasing Inc.,* 872 F.2d 978, 992–93 (Fed.Cir.1989) (holding plaintiff

---

**24.** A prior material breach excuses future breaches even if the party committing the later material failure to perform was unaware of the prior material breach at the time of the subsequent breach. *Christopher Vill.,* 360 F.3d at 1337.

**25.** Repudiation, by definition, as an outright refusal to perform, is a material breach if left uncured. The absence of an express termination clause does not prevent a non-breaching party from terminating the contract after the other party's repudiation. *Dow Chem.,* 226 F.3d at 1346.

**26.** A material breach frees the contractor from any obligations under the contract, even those subject to a disputes clause. *Alliant Techsystems,* 178 F.3d at 1276.

not required to perform its residual contract obligations after defendant's material breach); *Joseph Morton Co., Inc. v. United States,* 757 F.2d 1273, 1279 (Fed.Cir.1985) (holding fraud committed by contractor amounted to material breach justifying Government's termination of contract [27]).

### 2. Restitution

Outside of the FIRREA context, a dearth of cases fully explicating restitution exists in the jurisprudence of the Court of Claims and the Federal Circuit. The reason is that restitution technically constitutes a cause of action in equity separate from contract damages. *Texas Am. Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557, 1569 (Fed.Cir. 1995) ("Restitution is an equitable remedy whereby the wrongdoer is required to restore the injured person to the situation that prevailed before the wrong was committed."). Restitution then is a remedy typically not allowed in the context of an express contract, unless the contract has been rescinded, repudiated, materially breached, or otherwise annulled. Restatement § 384 cmt. a (Restitution is "available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.").

The few cases on restitution involving express government contracts, as a consequence, primarily address the remedy after the contracts putatively were no longer binding on the parties. *See, e.g., AT&T Communications, Inc. v. Perry,* 296 F.3d 1307 (Fed. Cir.2002) (denying restitution to contractor where Government did not breach nor repudiate contract and was not unjustly enriched); *Tangfeldt Wood Prods. v. United States,* 733 F.2d 1574 (Fed.Cir.1984) (denying claim of contractor seeking restitution for unjust enrichment because contract terminated under special catastrophes provision); *Pac. Architects & Eng'rs Inc. v. United States,* 203 Ct.Cl. 499, 491 F.2d 734 (1974) (refusing to grant contractor's claim for restitution based on alleged entitlement to rescind contract). "[I]t is generally the rule that restitution and a suit for damages are

alternative remedies." *Petrofsky v. United States,* 203 Ct.Cl. 347, 488 F.2d 1394, 1405 (1973). The remaining cases concerning restitution involve claims based on unjust enrichment. *See, e.g., Ultra–Precision Mfg., Ltd. v. Ford Motor Co.,* 411 F.3d 1369 (Fed. Cir.2005) (consultant suing for unjust enrichment of company owning patent from alleged joint inventorship); *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.,* 342 F.3d 1298 (Fed.Cir.2003) (professors claiming restitution for unjust enrichment against corporation using their invention to obtain patent); *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855 (1978) (state suing United States in restitution for benefits conferred after breach of implied contract).

### 3. FIRREA cases

The litigation spawned by the passage of FIRREA provided the vehicle for the Federal Circuit's view of restitution as a "fall-back" to lost profits, although there have been hints of such possible use of restitution in its precedent. *See, e.g., Arizona,* 575 F.2d at 864 (stating "[o]rdinarily, a party injured by the breach of a contract is entitled to be placed in the position he would have been had the promised performance been carried out, but we have said that restitution, 'making plaintiff whole,' may also be appropriate"). In *Far West Federal Bank, S.B. v. Office of Thrift Supervision,* 930 F.2d 883 (Fed.Cir. 1991), the Federal Circuit affirmed a ruling denying the Government's motion to sever and transfer to the Court of Federal Claims the bank's claim for rescission and restitution because the remedy was "simply a disguised contractual claim for money damages." *Id.* at 888. However, the Government also had argued that "the Tucker Act impliedly forbids equitable relief on a contract claim against the United States." *Id.* Not only has the Federal Circuit ruled that restitution is a remedy that can be awarded in a contract action by the Court of Federal Claims, but the remedy is appropriate when investors have made a capital contribution to a failing institution in order to fulfill their part of a FIRREA take-over and FIRREA subse-

---

**27.** Any degree of fraud practiced on the Government is material due to "the necessity for the Government to be secure in its confidence in its contractors." *Joseph Morton,* 757 F.2d at 1278.

quently breached the contract. *See California Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1347–48 (Fed.Cir.2001). ("*CalFed* "). The initial contribution is the measure of return. *See Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp.,* 25 F.3d 1493, 1505 (10th Cir.1994); *Far West Fed. Bank, S.B. v. United States,* 119 F.3d 1358, 1367 (9th Cir.1997).

The concept of total breach contemplates that "the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance." Restatement § 373(1). The Restatement's definition protects a party's restitutionary interest as one to prevent unjust enrichment, whereas caselaw seeks to restore the wronged party to the status quo before the contract was entered. Restitution was acknowledged "as a remedy [that] has a flexible meaning[,] and it may apply to a wide variety of fact situations." *California Fed. Bank, [FSB] v. United States,* 43 Fed.Cl. 445, 449 (1999), *aff'd in part, vacated in part, and rev'd in part on other grounds, CalFed,* 245 F.3d 1342. The trial court opinion in *CalFed* expounded on the juridical basis for restitution:

> The core principle of [restitution] is that a person who has been unjustly enriched at the expense of another must make restitution to the injured party.... This is not an operative rule, however, but a general principle.... Often restitution remains available where the defendant has not been enriched, but the plaintiff has suffered losses.
>
> . . . .
>
> Traditionally, a suit for damages was deemed to be an attempt to enforce the contract while restitution could be obtained only after recission of the contract. This traditional view has left its imprint on the rules governing the availability of restitution and the measure of recovery.... However, it is now generally recognized that the right to damages or to restitution is the same because "both [are] remedial rights based on the contract."

The aim of restitution is to place the plaintiff in the same economic position as it occupied before entering into the contract.

*Id.* at 449–50 (citations omitted). The trial court also expressed that "[r]eliance damages seek to place the plaintiff 'in as good a position as he would have been in had the contract not been made.' " *Id.* at 450 (quoting Restatement § 344(b)). Relying on *Acme Process Equipment Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509 (1965), to give flexibility to the doctrine of restitution, the trial court in *CalFed* may have muted the distinction between the right to reliance damages and the right to restitution. "Normally, the plaintiff seeks reliance damages when unable to prove expectancy with reasonable certainty because 'failure to prove profits will not prevent the party from recovering his losses for actual outlay and expenditure.' " *CalFed,* 43 Fed.Cl. at 450 (quoting *United States v. Behan,* 110 U.S. 338, 345, 4 S.Ct. 81, 28 L.Ed. 168 (1884)).

On appeal the Federal Circuit in *CalFed* held that the Government's breach was material, but affirmed the trial court's denial of restitution because determining the value to award would be too " 'speculative and indeterminate[,]' " *CalFed,* 245 F.3d 1342, 1351 (quoting *Glendale,* 239 F.3d at 1382), even though " '[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery[,]' " *id.* at 1350 (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)).

*Glendale* was decided in the interval between the trial court and appellate opinions in *CalFed.* *Glendale* initially recognized the traditional formulation of restitution. "When proof of expectancy damages fails, the law provides a fall-back position for the injured party—he can sue for restitution. The idea behind restitution is to restore—that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Glendale,* 239 F.3d at 1380. After deeming the Government's breach material, the Federal Circuit held that restitution could not be awarded because

> [i]n a very real sense, what the Government received in exchange for its promise was time—time to deal with other failing S & Ls, time to see what the market would do before having to commit substantial

resources to the problem. Though the value of time was more than zero, there is no proof of what in fact it was worth.

. . . .

This case, then, presents an illustration of the problem in granting restitution based on an assumption that the non-breaching party is entitled to the supposed gains received by the breaching party, when those gains are both speculative and indeterminate.

*Id.* at 1382. However, denying the plaintiffs restitution on these grounds does not comport with the Federal Circuit's position that recovery will not be barred because of the difficulty of determining how much to award. Perhaps the court did not try to determine the amount of restitutionary damages (even though the trial court already had done so in *Glendale Fed. Bank, FSB v. United States,* 43 Fed.Cl. 390 (1999)), not so much because "proof problems can in some situations prove to be insurmountable[,]" *Glendale,* 239 F.3d at 1380, but because the plaintiff could recover under a less complicated theory:

This does not mean that Glendale is without a remedy. Glendale recognized the problems in the restitution award, and cross-appealed, arguing that, should the court reject that award, Glendale nevertheless would be entitled to damages on a reliance theory. Indeed, the trial court recognized this third category of damages, known as reliance damages and added specified reliance damages, to the total award it granted plaintiff.

*Glendale,* 239 F.3d at 1382. Accordingly, what plaintiff was able to "fall-back" on was not so much a restitution theory, but a reliance theory which represents "damages designed to compensate a plaintiff for foreseeable loss caused by reliance on the contract." *Landmark Land Co. v. Fed. Deposit Ins. Corp.,* 256 F.3d 1365, 1369 (Fed.Cir.2001).

*Landmark* was the FIRREA case in which the Federal Circuit relied on *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), at the time recently decided by the Supreme Court, for the definition of restitution that has been applied in subsequent FIRREA cases:

[W]hen one party to a contract repudiates that contract, the other party is entitled to restitution for any benefit that he has conferred on the repudiating party by way of part performance or reliance. Restitution is available to a private party to remedy a contract breach or repudiation by the government.

*Landmark,* 256 F.3d at 1372 (internal citations and quotations omitted). The *Landmark* court then stated:

There are two alternative measures of relief in restitution. The first is the value of the benefits received by the defendant due to the plaintiff's performance. The second is the cost of plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract.

*Id.* (citations omitted). The trial court in *Landmark* had awarded the plaintiff restitution based on the value of the benefits given to the Government, but, on appeal, defendant argued, under *Acme,* that the award should be based only on the plaintiff's "cost of performance." *Id.* The Federal Circuit rejected defendant's argument, finding "nothing in *Acme* to support the government's position, and even assuming, arguendo, that this court's predecessor had so held in *Acme,* that holding was overruled by *Mobil Oil.*" *Id.* However, the court noted that "the purpose of restitution is to restore the plaintiff to its status quo ante . . . so that only the actual, or net, loss is compensated." *Id.* at 1373.

The Federal Circuit in *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363 (Fed.Cir.2003), subsequently acknowledged:

The Court of Federal Claims observed that *Acme* applied the theory of restitution of the first *Restatement of Contracts* § 347, *viz.* "to restore the innocent party to its pre-contract status quo." The Court of Federal Claims preferred the approach of the second *Restatement of Contracts* § 344, that the purpose of restitution is to prevent the unjust enrichment of the breaching party. We take note that this court in *Glendale,* 239 F.3d at 1379–80, did not deem these classical views incompati-

ble, for the applicability of restitution damages varies with the particular case.

*Id.* at 1376. The *LaSalle* court ultimately denied the plaintiff's claim for restitution because it "consider[ed] this case on the *Acme* premise," *id.*, and, like *Glendale*, the "restitution theory does not provide a usable measure of damages for the government's breach[,]" *id.* at 1377. The *LaSalle* court mentioned neither *Landmark* nor *Mobil Oil.*

It is not clear when "restitution" means "reliance," although the practical import can be the same. *Landmark*, 256 F.3d at 1373 ("In any event, the government's argument is irrelevant with respect to Landmark's initial contribution because the amount of the award would be identical under either standard."). However, whether to apply one or the other label can mean the difference between full recovery and no recovery when a *Winstar* plaintiff sues under only one theory, because material breach is a bar to recovery for restitution, but not reliance.

### 4. *Material breach*

A material breach excuses the non-breaching party from continuing performance. *Alliant Techsystems*, 178 F.3d at 1276; *Malone*, 849 F.2d at 1445. Whether a particular breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Stone Forest*, 973 F.2d at 1551.

In the legal parlance of FIRREA, this case has nothing to do with excusing plaintiffs' performance or determining whether plaintiffs committed a prior material breach. Plaintiffs already fully performed before the Government's breach. Their completed performance is the reason *Hansen III*, in listing the circumstances significant in determining whether a breach is material, opined:

> [I]t is not to be expected that, in every case, each of the five listed circumstances [of Restatement § 241] will be pertinent. For example, it is difficult to see how circumstance (c) ("the extent to which the party failing to perform or to offer to perform will suffer forfeiture") could apply to the United States in this case.

*Hansen III*, 367 F.3d at 1312. It is impossible for the United States to suffer forfeiture because plaintiffs completed their end of the bargain, which is atypical of material breach cases where a plaintiff alleges a material breach specifically to avoid completing performance. The sole reason that material breach is at issue now as a bar to recovery is because plaintiffs have chosen to "fall-back" on restitution.

The Court of Federal Claims and the Federal Circuit have reiterated numerous times that the Government's promised treatment of supervisory goodwill is the *sine qua non* of these contracts. For example, in assuming a material breach, the Federal Circuit stated "it is clear that the Government's promise that was breached had substantial value.... given the choice between purchasing a failing thrift without the Government's promise regarding supervisory goodwill and purchasing one with it, a reasonable banker would sure take the latter.... there can be no doubt that ... the promise was of substantial value[.]" *Glendale*, 239 F.3d at 1381–82. In *Winstar* the Supreme Court established that supervisory capital was the "essential" and "indispensable" consideration in the acquisition of insolvent thrifts such as those that Hansen acquired. 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964.

Therefore, the reliance of *Hansen III* on *Stone Forest* is puzzling. *Stone Forest* applies material breach to determine which party materially breached first in order to excuse the other from continuing performance. *Stone Forest*, 973 F.2d at 1550. Restitution is not mentioned. In sum, the bar to plaintiff's recovery of award in this case, whether labeled "fall-back restitution" or "reliance," ought not to be whether the Government's breach was material in that it should have excused plaintiffs performance after they had performed, but whether the breach went to the heart, or key precept for, the contract, which it did, and whether plaintiffs' claimed damages reflect the amount that plaintiffs contributed based on the crucial promise of goodwill treatment. However, FIRREA's law on restitution imposes the requirement on the non-breaching party to demonstrate that the breach of contract was material even though the element of relief—

excuse from further performance of the contract—is unavailable. Thus, materiality in these cases has come to signify proof that the regulatory maintenance agreement would not have been invoked absent FIRREA. *See Admiral Fin. Corp. v. United States,* 57 Fed. Cl. 418 (2003), *aff'd,* 378 F.3d 1336 (Fed.Cir. 2004).

### III. *The amount of goodwill that HSB was entitled to amortize*

■ Both parties presented evidence to substantiate their respective understandings of goodwill. The meticulous analysis and comprehensive testimony of its witnesses support the finding that defendant's explanation of goodwill is the proper method for calculating the goodwill generated in the merger of RVSL and Hammonton.

Plaintiffs did not demonstrate an actual use of this amount of goodwill. An analysis of the actual treatment of goodwill shows that HSB amortized approximately $20 million, and not the $40 million to which plaintiffs claim entitlement. Plaintiffs could not prove that HSB actually accounted for goodwill, or applied goodwill, in the manner that they contend, whereas defendant's documentary evidence and testimony established how HSB accounted for $20 million in goodwill and approximately another $20 million in a form of cash assistance, the covered assets.

The 1989 ROE, prepared by the OTS, shows that goodwill was separated into two categories: amortizing and non-amortizing. The language of the 1989 ROE is particularly informative in how FSLIC covered-asset assistance was to be handled:

> HSB valued all of the [covered] assets and liabilities acquired as of May 25, 1988, at their then fair market value in accordance with generally accepted accounting principals and established, as appropriate, premiums and discounts. The excess of fair market value of the liabilities assumed over the fair market value of tangible assets acquired has been recorded as an unidentifiable intangible asset.

The listing of amortizing and non-amortizing goodwill in the 1989 ROE contributes to the proper understanding of the handling of goodwill: In the computation of non-amortiz-

ing goodwill, a note states that the number "[r]epresents the amount of anticipated FSLIC assistance on the original covered assets, and equals the FSLIC covered-asset balances less the current adjusted institution's book carrying values." The combination of these explanations signifies that the unidentifiable intangible asset—the amortizing goodwill—is separate and distinct from the FSLIC covered-asset assistance, which serves as non-amortizing goodwill.

Plaintiffs insist that HSB was required to use GAAP accounting, which was not reflective of RAP. Particularly detrimental to plaintiffs' position was Mr. Randlett's testimony concerning the TFR prepared by HSB for December 1989. Mr. Randlett testified convincingly about the accounting methodology and demonstrated that the figures used were based on $21.6 million in amortizable goodwill:

> So if we have a GAAP basis on one column and a RAP basis on another and the starting point is 21,600,000 for both, the GAAP basis is a 12 year, the RAP basis is 25, which for GAAP basis is 1.8 million a year which is 150,000 a month. For RAP basis it's 72,000 a month.

> Then for December 31, 1989, I think we have 19 months of amortization that has taken place, and so that would be 1,368,000 for RAP and 2,850,000 on a GAAP basis. And that is 1,482,000 difference between those two, which is identical in amount to the line item [in the December 1989 TFR] numbered 982, described as "amortization of goodwill under accounting forbearances" under the heading "calculation of regulatory capital."

Tr. at 1182. *See* DX 1670 (showing calculations). These calculations reflected in the TFR undermine plaintiffs' contention that amortizable goodwill was anything other than $21.6 million. The emphatic testimony of plaintiffs' accountant Mr. Dougherty attested to the courage of the witness's convictions, but he had neither the professional ballast nor coherent explanation to overcome Mr. Randlett's expert testimony or the insightful analysis of Mr. DuTullio, the OTS accountant.

HSB's 1990 Capital Plan detracts from plaintiffs' position regarding HSB's goodwill calculations. As discussed above, this plan stated that the merger resulted in approximately $40 million in goodwill, and that included "the expected future recovery from the sale of assets guaranteed by the FSLIC." While this notation might appear helpful to plaintiffs, it serves as an acknowledgment of the different treatment received by the FSLIC covered-asset assistance. The language indicates that the covered-asset assistance is not, as plaintiffs assert, simply encapsulated in the amortizing goodwill. Mr. Curran's testimony supports the notion of goodwill amounting to $40 million and enforces the separation of this amount into FSLIC receivable monies, a non-amortizing asset, and supervisory goodwill, an amortizing asset. Tr. at 1844–45.

According to Allen I. Katz, the Examiner-in–Charge of the 1989 ROE, HSB did not amortize the FSLIC covered-asset assistance, which was categorized as non-amortizing goodwill. As HSB received FSLIC covered-asset assistance, HSB reduced the non-amortizing goodwill balance by the amount received. Although cash is considered a tangible asset, and HSB referred to the FSLIC cash assistance as non-amortizing goodwill, as opposed to a "receivable," Mr. Katz did not regard the labeling of FSLIC assistance by HSB as of import to the OTS. Instead, Mr. Katz was concerned with "the nature of it, the fact that it wasn't being amortized, and [the non-amortizing goodwill] was being reduced upon receipt of the FSLIC assistance." Tr. at 1658. Mr. Katz, however, did become aware during a February 1991 meeting that HSB wanted to amortize and include in its regulatory capital the non-amortizing goodwill account balance.

Plaintiffs face a daunting task in light of this evidence about how HSB accounted for goodwill. Despite his first-hand knowledge of HSB's accounting, the court cannot give decisive weight to Mr. Dougherty's testimony in support of HSB's goodwill practices because defendant's evidence was more probative that the $40 million goodwill includes both supervisory goodwill and the identifiable intangible asset of FSLIC assistance. As a consequence, the former is to be reduced by the latter, per FAS 72.

Finally, plaintiffs argue that defendant is bound to the FHLBB's acceptance of the manner in which the contracting parties accounted for the goodwill. As of the one-year mandatory look-back, the FHLBB did not object to the amount of goodwill. Indeed, in answer to HSB's October 16, 1990 complaint filed in the District Court of New Jersey requesting injunctive relief to restrain enforcement of FIRREA's minimum capital requirements and the operating restrictions put on HSB, the OTS admitted "that the FHLBB did not object to [HSB's] calculation of $40,485,069 as the amount of supervisory goodwill created by the merger." Answer of Defendants Office of Thrift Supervision and T. Timothy Ryan, Jr., Director of the Office of Thrift Supervision, and Counterclaim of Director of the Office of Thrift Supervision, filed in *Hansen Sav. Bank*, No. 90–4092 (D.N.J. Mar. [ ], 1991), ¶ 35. The United States Department of Justice was aware of the litigation position taken by the OTS, as evidenced by the Certificate of Service attached to the answer. As that litigation matured, however, OTS retracted its position, as revealed in a later filing in the same lawsuit:

> OTS contends that Hansen has overstated the amount of supervisory goodwill which it can properly carry on its books by approximately $16 million. For purposes of the determination as to whether grounds existed to place Hansen into receivership, however, OTS gave Hansen full credit for all goodwill claimed by Hansen.

Defendant's Memorandum in Opposition to Plaintiff's Motion for a Temporary Restraining Order, filed in *Hansen Sav. Bank*, No. 90–4092, at 3 n. 4 (D.N.J. Jan. [ ], 1992).

The doctrine of judicial estoppel prevents a party from changing its position during litigation "simply because his interests have changed." *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). When determining whether to apply judicial estoppel, courts may examine several factors, including whether the party successfully persuaded the court to accept its original position and whether the party would receive "an unfair advantage or impose

an unfair detriment on the opposing party if not estopped." *Id.* at 751, 121 S.Ct. 1808. The doctrine is designed to prevent "intentional self-contradiction" and is improperly applied "when the former position was the result of inadvertence or mistake." *Lampi Corp. v. Am. Power Prod.*, 228 F.3d 1365, 1377 (Fed.Cir.2000). Thus, the court does no disservice to the important purposes underlying holding parties to judicial admissions by acknowledging that a response to an injunctive action is an evolving position, and the facts and legal positions should be taken in view of the emerging facts as they become known to the litigating parties. *See SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d 1278, 1291 (Fed.Cir.2005) (holding that courts should not use doctrine of judicial estoppel to prevent evolution of arguments, but should permit "preliminary construction[s] made without full development of the record or issues [to remain] open to revision").

It is also necessary to note that the evidence presented by plaintiffs resulting from work performed by HSB's accountant KPMG on behalf of HSB does not bolster plaintiffs' argument that the FHLBB accepted plaintiffs' calculations of goodwill. KPMG and HSB are, of course, separate entities. KPMG's analyses on behalf of HSB noted that the conclusions presented were based on information and data provided by HSB to KPMG for the purposes of analysis. Specifically, the September 22, 1988 accountant's letter from KPMG, required to effect the merger, states that "[t]he facts, circumstances, and assumptions relevant to the transactions as provided to us by management of [HSB] are as follows[.]" Additionally, the CPA Audit Report of December 31, 1988, by KPMG on behalf of HSB notes that KPMG audited HSB's consolidated balance sheet, and that "[t]hese consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit." In other words, KPMG was assigned the task of evaluating data and financial information presented to it; the accountant was not asked to create the actual financial data with which it drew its conclusions.

## IV. *Forbearance regarding counting of cash assistance as goodwill*

Defendant contends that plaintiffs' understanding of the forbearances in this matter is contrary to the contract between the parties—specifically, the issuance, or lack thereof, of a particular forbearance that would allow HSB to count FSLIC cash assistance as goodwill. Such a forbearance would "authorize a *limited* deviation from GAAP by permitting [the institution] to credit [a FSLIC] cash contribution to increase regulatory capital instead of requiring [the institution] to credit the cash contribution to decrease the ... goodwill." *Coast Fed. Bank, F.S.B. v. United States*, 323 F.3d 1035, 1039 (Fed.Cir.2003).

An "SM–1" forbearance permits crediting the FSLIC cash contribution to an institution's net worth account. *Id.* at 1041 (Michel, J., concurring). In his concurrence (now) Chief Judge Michel noted that such a forbearance is typically contained in a side letter to the agreement authorizing forbearances from GAAP. As such, "this language can be nullified any time by subsequent changes in regulation or policy[,]" but when the forbearance is actually inserted into the agreement, the Government cannot cancel the forbearance during the time between the signing of the agreement and the crediting of the cash contribution to the net worth account. *Id.* Thus, without the SM–1 forbearance, an institution cannot apply FSLIC assistance to capital, and must place all debits and credits concerning FSLIC cash assistance on the asset side of its ledger. *Id.*

Plaintiffs introduced an April 24, 1984 FHLBB Memorandum regarding forbearances provided during supervisory mergers. Plaintiffs called attention to the language of forbearance A–1 under "Standard forbearances that *will be* granted in connection with supervisory mergers[,]" which addresses the statutory reserve and net worth requirements of section 563.13 of the Rules and Regulations for Insurance of Accounts. This language is tracked in the first forbearance in HSB's forbearance letter. The more significant point that must be drawn, however, is that this type of forbearance is listed un-

der the section specifying forbearances that "*will be*" granted. In contrast, the SM–1 forbearance discussed in *Coast Federal* is listed under the section that addresses "Forbearances that *may be* granted in connection with supervisory mergers[.]" This, in essence, provides the parties with the opportunity to incorporate this forbearance into a supervisory merger. At the same time, it contemplates that a forbearance may not be included in the merger agreement. Such was the case in the agreement between the parties.

A similar question arose in *Sterling Savings v. United States,* 57 Fed.Cl. 445, 447 (2003). In determining the proper amortization, if any, of FSLIC cash contributions in connection to the acquiring institution's acquisition of a failed thrift, *id.* at 445, the court cited FAS 72's requirement that any FSLIC cash assistance correspondingly reduce the amount of goodwill from the transaction. To avoid this requirement and allow the cash assistance to serve as regulatory capital, the acquiring institution must have secured a forbearance. *Id.* at 447. The acquiring institution in *Sterling* received an SM–1 forbearance that, by explicit terms, allowed it to credit FSLIC cash assistance to its net worth. *Id.* The plaintiff also received an SM–2 forbearance, which allowed it to amortize goodwill for a period different than that prescribed by FAS 72. *Id.* at 451–52. *Sterling* demonstrates that forbearances are neither standard nor presumed; instead, many, including the SM–1 forbearance that would have assisted HSB in its accounting of FSLIC assistance, are granted when specified. While HSB did receive an SM–2 forbearance that altered the amortization period allotted by FAS 72, it did not receive an SM–1 forbearance. Therefore, HSB cannot apply FSLIC cash assistance to its regulatory capital.

Not only does the caselaw not support plaintiffs' position, but defendant's witnesses also called into question HSB's accounting practices concerning goodwill and FSLIC assistance. Mr. DuTullio's testimony manifested legitimate concern over HSB's accounting methodologies. According to Mr. DuTullio,

my main issue was that as the [covered] assets were disposed of and the cash was received, that identifiable asset or FSLIC receivable or nonamortizing goodwill, whatever you choose to call it, should be reduced, just like any other receivable. When the cash comes in, the receivable gets reduced. Further, not only does the asset get reduced, there's no add-back to regulatory capital, because that, in fact, that identified intangible is reduced. If you included it again, that would be double-counting the asset.

Tr. at 1212. Mr. DuTullio voiced skepticism about HSB's accounting practices, specifically HSB's failure to deduct FSLIC covered-asset assistance from the total $40 million in goodwill. He reiterated that "to not reduce regulatory capital by the amount of cash received would be incorrect accounting and misleading." Tr. at 1290. This constitutes the "double-counting" of the same asset, meaning that "like any receivable, if you have the receivable on the asset side of your balance sheet and the cash comes in, if you count both the cash and the receivable, you're counting it twice. The cash, in fact, replaces the receivable[.]" Tr. at 1290.

Most damaging to plaintiffs' assertions about the amount of amortizable goodwill was Mr. DuTullio's explanation of the basic accounting for the merger: The original Hammonton deficit was approximately $102 million. At the time of the merger, FSLIC paid HSB approximately $62 million in cash, which reduced the deficit to approximately $40 million. Mr. DuTullio explained that the receipt of FSLIC assistance impacted this remaining $40 million by "reduc[ing] it as well, just as the 62 [million] was received in cash ... the approximately 20 million [for covered assets] was received in cash as well, and that reduced the deficit by that amount, by approximately 20 million." Tr. at 1292. HSB did not receive a forbearance that would alter the prescribed treatment of FSLIC assistance. Mr. DuTullio noted that paragraph 7 of the Forbearance Letter grants a forbearance only with regard to the amortization period for the unidentified intangible asset and provides no forbearance in the way of the identified intangible asset.

Tr. at 1290. Hence, HSB was to reduce the amount of goodwill by FSLIC assistance.

Mr. Randlett further discredited plaintiffs' accounting methods for FSLIC assistance in addressing the CPA Audit Report of December 31, 1988, prepared by KPMG, plaintiffs' accountant. Contrary to HSB's claims, this report demonstrated that KPMG knew that FSLIC assistance was both estimable and probable, directly addressing the requirements of FAS 72. What Mr. Randlett "found most informative in [the report] was the statement on page 9, the first bullet, where it's stated 'after consideration of FSLIC assistance of approximately 18,900,-000, the fair value of the liabilities assumed exceeded the fair value of assets acquired by approximately 21,600,000.'" Tr. at 1184. This indicated "a premise that [FSLIC assistance] is considered, it does exist and it can be turned into a cash asset ultimately." Tr. at 1184. Any contention that FSLIC assistance was not estimable or probable was defeated through the December 31, 1988 report and Mr. Randlett's complementary testimony.

Because HSB did not receive an SM–1 forbearance—a forbearance that the FHLBB was not obligated to give in a supervisory merger—HSB was required to adhere to FAS 72's prescription that HSB reduce the amount of goodwill on its books as FSLIC covered-asset assistance was received. HSB did not have the authority to amortize the entirety of the $40 million in goodwill.

## CONCLUSION

■ Accordingly, based on the foregoing, the court finds and concludes that plaintiffs have not proved by a preponderance of evidence that the Government's breach of contract by dishonoring its commitment to allow HSB to count goodwill toward regulatory capital requirements constituted a material breach of contract. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.